UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| RONALD K. LINDE, MAXINE H. LINDE, THE RONALD AND MAXINE LINDE FOUNDATION, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>FIFTH STREET ASSET MANAGEMENT INC., LEONARD M. TANNENBAUM, BERNARD D. BERMAN, ALEXANDER C. FRANK, STEVEN M. NOREIKA, WAYNE COOPER, MARK J. GORDON, THOMAS L. HARRISON and FRANK C. MEYER,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No.<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff, individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Fifth Street Finance Corp. ("FSC"), Fifth Street Senior Floating Rate Corp. ("FSFR," and together with FSC, the "Funds"), and Fifth Street Asset Management Inc. ("FSAM," and together with the Funds and related entities, "Fifth Street"), as well as media reports and analyst reports about Fifth Street.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons who purchased FSAM common stock in or traceable to FSAM's October 30, 2014 initial public offering (the "IPO") for violations of the Securities Act of 1933 (the "1933 Act") brought against FSAM and certain of its officers and/or directors.

2.      Fifth Street is a credit-focused asset management enterprise founded by defendant Leonard M. Tannenbaum ("Tannenbaum"), FSAM's Chief Executive Officer ("CEO") and Chairman of FSAM's Board of Directors (the "Board").  FSC and FSFR are two publicly traded asset portfolio companies within the Fifth Street enterprise.  Both FSC and FSFR lend to and invest in small and mid-sized companies in connection with investments by private equity sponsors with the goal of generating investment income.  This income is then paid out to shareholders in the Funds in the form of dividends.

3.      Defendant FSAM is the asset manager and investment advisor for the Funds. FSAM earns millions of dollars in fees from the Funds annually for the provision of investment

advisory vices and administrative support.  As of June 30, 2014, FSC provided about 90% of FSAM's assets under management ("AUM"), and thus FSAM's primary revenue source.  FSFR, meanwhile, provided an additional 5% of FSAM's AUM.  The amount of fees paid by the Funds to FSAM is largely determined by the Funds' gross portfolio assets.  Thus, FSAM may increase the amount of fees it receives from the Funds by borrowing money or conducting capital raises through equity offerings to make additional investments that increase the size of the Funds' asset portfolios.  In addition, because FSAM derives its income primarily from the Funds, FSAM's performance is determined largely by the success and continued viability of the Funds.

4.     On October 28, 2014, FSAM filed an amended S-1 Registration Statement for the FSAM IPO, which was declared effective on October 29, 2014 (the "Registration Statement," and together with the IPO prospectus filed October 30, 2014 (the "Prospectus"), the "Offering Materials").   In the Offering Materials, defendants made materially false and misleading statements of fact and failed to disclose facts necessary to make the statements made therein not misleading, including, among other statements, that: (i) FSAM had $4.2 billion AUM from FSC as of June 30, 2014, when in fact a substantial portion of FSC's portfolio had been impaired on a cost basis prior to the IPO; (ii) FSAM had increased its management fee revenues by a compound annual growth rate ("CAGR") of nearly 50% year-over-year during the six months ended June 30, 2014 due to FSAM's "outstanding performance," when in fact the growth in fee revenue was largely due to the overstatement of FSC's assets and dilutive stock offerings detrimental to the Funds' shareholders; and (iii) FSAM had "high-quality and predictable earnings," when in fact FSAM's revenues were unsustainable and the result of conduct that placed FSAM's most important asset – its management contract with FSC – at risk.

5.     Defendants sold 6 million FSAM shares to the public in the IPO at $17 per share, generating more than $100 million in gross proceeds for defendant Tannenbaum and other pre-

IPO owners of FSAM, who also retained ownership interests in FSAM worth hundreds of millions of dollars that they could cash out at a later date.

6.      Since the IPO, the price of FSAM shares has plummeted because, among other reasons: (i) FSC disclosed that a substantial portion of its debt portfolio had entered non-accrual (including about 4% of FSC's portfolio prior to the IPO); (ii) Fitch Ratings Inc. ("Fitch") downgraded FSC to BB+ from BBB- on a negative outlook due largely to FSAM's poor management of FSC and its credibility problems with investors; (iii) FSC has had to restate its financials for three consecutive quarters, including the quarter in which the IPO was conducted, due to material weakness in its controls over financial reporting; and (iv) RiverNorth Capital Management, LLC ("RiverNorth"), which purports to be FSC's largest shareholder, has called for the termination of FSC's advisory agreement with FSAM because of "FSC's dramatic underperformance, problematic conflicts of interest and an abusive fee structure."

7.      On December 9, 2015, FSAM stock closed at $4.03 per share, *more than 76% below the IPO price*.

### JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to §§11, 12(a)(2), and 15 of the 1933 Act [15 U.S.C. §§77k, 77l(a)(2) and 77o].  Jurisdiction is conferred by §22 of the 1933 Act [15 U.S.C. §77v].

9.      Venue is proper pursuant to §22 of the Securities Act and 28 U.S.C. §1391(b) and (c) as many of the acts and conduct complained of herein occurred in this District.  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  In addition, defendant FSAM and the Funds are headquartered in this District and numerous of the Individual Defendants (as defined below), including defendant Tannenbaum, reside in this District.

10.     In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchanges and markets.

**PARTIES**

11.     Plaintiffs Ronald K. Linde, Maxine H. Linde , and The Ronald and Maxine Linde Foundation  purchased FSAM stock pursuant to the Offering Materials and was damaged as a result of defendants' wrongdoing as alleged in this complaint.

12.     Defendant FSAM is a credit-focused asset manager and the investment advisor for FSC, FSFR and various private Fifth Street funds.[1]

13.     Defendant Tannenbaum founded Fifth Street in 1998.  He served as Chairman, CEO and a director of FSAM at the time of the IPO.

14.     Defendant Bernard D. Berman ("Berman") served as the Co-President, Chief Compliance Officer and a director of FSAM at the time of the IPO.

15.     Defendant Alexander C. Frank ("Frank") served as the Chief Operating Officer and Chief Financial Officer of FSAM at the time of the IPO.

16.     Defendant Steven M. Noreika ("Noreika") served as the Chief Accounting Officer of FSAM at the time of the IPO.

17.     Defendant Wayne Cooper ("Cooper") served as a director of FSAM at the time of the IPO.

18.     Defendant Mark J. Gordon ("Gordon") served as a director of FSAM at the time of the IPO.

---

[1]     Prior to and after its IPO, FSAM and its principals operated through Fifth Street Management LLC, which is used synonymously with FSAM herein.

19.     Defendant Thomas L. Harrison ("Harrison") served as a director of FSAM at the time of the IPO.

20.     Defendant Frank C. Meyer ("Meyer") served as a director of FSAM at the time of the IPO.

21.     The defendants identified in ¶¶13-20 are referred to herein as the "Individual Defendants."  The Individual Defendants signed the Registration Statement.

## SUBSTANTIVE ALLEGATIONS

**Background to FSAM IPO**

22.     Defendant Tannenbaum founded Fifth Street in 1998 as an asset management company specializing in raising funds from private investors and investing in small and mid-sized companies.  Thereafter, defendant Tannenbaum and his associates launched several investment funds under the Fifth Street moniker.  In June 2008, FSC was the first of these funds taken public.  FSC is a specialty finance company that lends to and invests in small and mid-sized companies, primarily in connection with investments by private equity sponsors.  As of September 30, 2013, FSC's portfolio totaled $2.1 billion in assets and was comprised of 99 investments, 86 of which were in operating companies and 13 of which were in private equity funds.[2]

23.     In July 2013, Fifth Street took a second investment fund public, FSFR.  FSFR provides financing in the form of floating rate senior secured loans to mid-sized companies, primarily in connection with investments by private equity sponsors.  As of September 30, 2013, FSFR's portfolio totaled $101.5 million in assets and was comprised of eight debt investments, all of which were in operating companies.

---

[2]     The fiscal years for FSC and FSFR end on September 30 of the corresponding calendar year.  FSAM's fiscal year ends on December 31 of the corresponding calendar year.

24.     Both FSC and FSFR are business development companies ("BDCs") under the Investment Company Act of 1940 [15 U.S.C. §80a-2, *et seq.*].  As BDCs, the Funds are subject to certain regulations, including limits on how much debt they may incur, the prohibition of most affiliated transactions, and regulation by the SEC.  *See, e.g.*, 15 U.S.C. §§80a-54-80a-65.  The investment objectives of both FSC and FSFR are to maximize their respective portfolio returns by generating investment income.  In turn, the Funds pay out a portion of this investment income in dividends to their respective shareholders.

25.     FSAM earns fees from FSC and FSFR (as well as other asset portfolios under its management) for the provision of advisory and management services.  Under the terms of its investment advisory agreements with FSC and FSFR, FSAM earns a base management fee calculated as a percentage of the Funds' gross assets, including leveraged assets and excluding any cash and cash equivalents.  FSAM also receives incentive fee income pursuant to a complex formula tied to the Funds' investment income and other performance factors.[3]  As a result of this fee arrangement, the greater the amount of the Funds' assets and investment income, the higher the revenues generated by FSAM.

26.     For example, in fiscal 2013, FSC paid $33 million in base management fees, $28 million in incentive fees and $45 million in "other expenses" to FSAM and other entities controlled by defendant Tannenbaum, for a total of $106 million.  This compares to FSC's investment income of $221.6 million during the same period, meaning that FSAM received almost half of FSC's investment income in the form of fees and expenses for the year.

27.     Throughout 2014, in the lead up to the IPO, FSAM dramatically increased its AUM.  For example, in the first six months of FSC's fiscal 2014, FSC's total assets ballooned

---

[3]     The Funds also pay administrative fees to FSC, Inc. (another entity owned and controlled by defendant Tannenbaum) for the use of facilities and equipment and administrative services incidental to the Funds' day-to-day operations.

from $2.1 billion to $2.8 billion, an increase of over 33%.  Nevertheless, FSC maintained that

99.5% of its investments were performing at or above expectations and that FSC had zero

investments in non-accrual status as of March 31, 2014.  During this time, FSC also recorded a

$63 million increase in assets from operations, and a net realized gain of $1.7 million on its

investments.    In SEC filings and investor presentations, FSC represented that it maintained a

"high quality" portfolio with a "conservative" investment policy and ample protections to

minimize the risk of any investment losses and maximize FSC's net investment income.  For

example, in a February 6, 2014 earnings conference call with investors, defendant Tannenbaum

stated (who was also CEO of FSC at the time):

> ***The credit performance of the portfolio is strong, and we reported three
> quarters in a row with no loans non-accrual***.  This excellent credit performance
> is a result of our deep bench of the experienced underwriters and portfolio
> managers and our multi-million dollar investment systems.
>
> Our overall portfolio remains healthy, as borrowers are benefiting from a
> modestly growing economy and support from the private equity sponsors.
>
> We are moving forward on several initiatives intended to improve net
> investment income per share over time.  While the progress has been slower than
> expected, ***we continue to move in the right direction and expect these initiatives
> to collectively benefit growth and net investment income in future quarters.***

28.    Throughout this time period, FSC also emphasized that it would pursue a

sustainable dividend policy – then set at a $1.00 annualized run rate – that was consistent with

FSC's net investment income.  For example, in an earnings conference call with investors on

November 26, 2013, defendant Tannenbaum stated:

> ***We understand that setting a dividend consistent with net investment
> income is important to our equity investors***, our debt investors, as well as the
> rating agencies to maintain and perhaps improve our investment grade rating.  We
> believe our net investment income per share in fiscal-year 2014 should meet or
> exceed $1.00 per share annual dividend rate.
>
> ***The Board of Directors' decision to realign the dividend at the current
> level is a reflection of the market environment and the high quality of the
> portfolio***.  In short, we believe the realignment to the dividend is the right thing
> for our shareholders in the short and long-term, and here at Fifth Street, we are

committed to ensuring FSC's long-term success, which will, in turn, be beneficial to our shareholders.

\*       \*       \*

I think we could actually run lower than target leverage and earn our $1.00, but the idea is not to cut the dividend twice, right. The idea is to get the dividend to a number that you can meet or exceed . . . .

During the February 6, 2014 conference call, defendant Tannenbaum continued on this theme, stating that FSC would not raise the dividend until "we can meet or exceed the dividend for a couple of quarters and give that confidence, . . . *[w]e want to make sure that it's sustainable*."

29.     On July 7, 2014, FSC issued a press release announcing an increase of its monthly dividends by 10% to $0.0917 per share for September through November 2014.  This is the time frame in which the IPO was conducted, and indicated to investors in the IPO that FSAM's primary source of revenue, FSC, would have stable and sufficient income to pay the increased dividend as well as the fees it owed to FSAM.

30.     On July 11, 2014, FSC priced a secondary offering of 13.25 million shares of its common stock at $9.95 per share, generating gross proceeds of $131.8 million, which was used to increase its investments, and thus FSAM's AUM.

31.     On July, 22, 2014, FSAM submitted a confidential draft of the Registration Statement with the SEC for review pursuant to Title I, Section 106 of the Jumpstart Our Business Startups Act.

32.     On August 7, 2014, FSC held a conference call with analysts and investors to discuss its fiscal 2014 third quarter results.  On the call, defendant Tannenbaum expressed "confidence" that FSC would generate investment income sufficient to cover the recently announced dividend increase beginning in September 2014, which again signaled to the market that FSAM would have stable income from its primary revenue source, FSC:

*In early July, our Board of Directors declared a 10% increase in our monthly dividend from 8.33 cents to 9.17 cents per share, beginning in*

***September 2014***.  The new dividend represents $1.10 annualized run rate and over an 11% yield on the current stock price.

> ***The Board's confidence and our improved earnings power is primarily due to funding investment in Senior Loan Fund Joint Venture 1, or SLF JV 1, which should lead to growth in investment income.***  We are working on ramping and expanding this JV and forming similar partnerships, because we have ample capacity relative to the 30% regulatory cap on non-qualifying assets.

                                    *        *        *

> We are confident in the outlook for potential future earnings growth later in the calendar year, based on solid performance in our primarily senior secured portfolio.  ***We look forward to providing updates as we make further progress on our multiple initiatives to improve net investment income, including growing SLF JV 1, and potentially other similar entities***.

> Many of these initiatives would not be possible without the significant investment we have made in the overall Fifth Street platform and the size of Fifth Street Finance Corp's balance sheet.  ***Future success in these areas should further differentiate us from our peers***.

33.    On August 13, 2014, FSFR commenced a secondary offering of 22.8 million shares of its common stock.  This represented approximately 3.5 times FSFR's initial public offering of 6.7 million shares.  FSFR priced the shares at $12.91 per share, for total gross proceeds of more than $294 million.  This offering price was substantially below FSFR's then-current share price, which had closed at $13.31 per share on August 13, 2014, and was also substantially below FSFR's reported net asset value per share, which was recorded at $15.13 per share as of June 30, 2014.  As a result, the offering was dilutive to FSFR's existing shareholders and represented a steep discount to FSFR's then-current share price.  Nevertheless, the substantial capital raise allowed FSAM to substantially increase the amount of capital under its management leading up to the IPO and, as a result, the expected amount of fees it would earn.

34.    On September 8, 2014, FSAM filed a registration statement for its IPO on Form S-1.

35.     On September 12, 2014, FSFR issued a press release announcing that its board had declared a $0.30 quarterly dividend for the quarter ended December 31, 2014.  The release further stated in part:

> "We are pleased to reaffirm a stable and consistent dividend of $0.30 per share.  FSFR's portfolio of senior secured floating rate loans continues to perform well and the additional equity we raised should provide the necessary scale to our business.  ***The strength of Fifth Street's middle market lending platform continues to provide attractive investment opportunities, which gave our Board of Directors added confidence in making its most recent dividend declaration***," stated FSFR's Chief Executive Officer, Ivelin M. Dimitrov.

36.     Furthermore, before the IPO and unknown to investors, at least three investments by FSC should have been placed on non-accrual as non-performing loans: TransTrade Operators, Inc. ("TransTrade"), Phoenix Brands Merger Sub LLC ("Phoenix") and JTC Education, Inc. ("JTC").   The combined annual investment income for these three investments was approximately $8.8 million in fiscal 2014, or approximately $2.2 million per quarter, and represented an overstatement of approximately 6.8% of FSC's reported net investment income for the quarter ended June 30, 2014, and approximately 6.3% of FSC's net investment income for the quarter ended September 30, 2014.  These three investments were all belatedly placed on non-accrual status and written down during FSC's first fiscal quarter of 2015 (ended December 31, 2014), ***after*** the FSAM IPO had been completed.  However, defendants' overstatement of investment income from these three investments had a material impact on FSC's financial statements for the third and fourth fiscal quarter of 2014, as estimated in the chart below, which in turn impacted FSAM's revenue stream, drew into question FSAM's performance, and increased the risk that FSAM would be replaced as FSC's investment advisor:

**FIFTH STREET FINANCE CORP.**
**[FSC]**

| (In Millions of $ Except Percentages and Earnings Per Share (EPS)) | 3Q14 (Quarter Ended June 30, 2014) | 4Q14 (Quarter Ended September 30, 2014) |
|---|---|---|
| Net Investment Income (NII) as Reported | $34.7 | $37.5 |
| Correction for Non-accrual Investment Income | ($2.2) | ($2.2) |
| Corrected NII | $32.5 | $32.5 |
| Percentage Overstatement of NII | 6.8% | 6.3% |
| | | |
| Net Increase in Net Assets Resulting from Operations as Reported | $20.3 | $28.4 |
| Correction for Non-accrual Investment Income | ($2.2) | ($2.2) |
| Corrected Net Increase in Net Assets Resulting From Operations | $18.1 | $26.2 |
| Percentage Overstatement of Net Increase in Net Assets Resulting From Operations | 12.2% | 8.4% |
| | | |
| EPS-Basic as Reported | $0.15 | $0.19 |
| EPS Correction for Non-accrual Investment Income (Rounded) | $0.02 | $0.02 |
| Corrected EPS (Rounded) | $0.13 | $0.17 |
| Percentage Overstatement of EPS-Basic (Rounded) | 12.2% | 8.4% |

37. In addition, there were material weaknesses at the time of the IPO related to FSC's validation of its portfolio companies' data and its revenue recognition practices. Because FSAM's income is derivative of FSC's income and FSAM is responsible for FSC's revenue recognition practices as its investment advisor, these undisclosed deficiencies materially impacted FSAM as well.

**The IPO**

38. On October 28, 2014, FSAM filed the Registration Statement on Form S-1/A for the sale of 6 million Class A common shares to the public, which was declared effective on October 29, 2014. As explained in the Registration Statement, the IPO would allow defendant Tannenbaum and his associates to cash out for tens of millions of dollars. None of the proceeds were to be retained by FSAM, but rather could be used by FSAM to purchase ownership interests, called "Holdings LP Interests," from the principals of FSAM. According to the FSAM IPO Registration Statement, the principals of FSAM would be issued more than 42.8 million shares of Class B common stock and an equal number of Holdings LP Interests (with an estimated 40.2 million Holdings LP Interests to be held by defendant Tannenbaum and

approximately 2.6 million Holdings LP Interests to be held by defendant Berman following the FSAM IPO).  Although the Class B common stock held no economic rights, it entitled holders to five votes per share (as opposed to one vote per share for the Class A common stock), which would give insiders approximately 97.3% of the combined voting power of FSAM.  In addition, the Holding LP Interests could be exchanged on a one-to-one basis for shares of Class A common stock two years after the offering.  The FSAM IPO Registration Statement further stated that 7.5 million shares of Class A common stock had been reserved for issuance under FSAM's 2014 Omnibus Incentive Plan.  Consequently, several of the Individual Defendants stood to reap more than $100 million combined in immediate gross proceeds from the FSAM IPO in addition to ownership interests worth hundreds of millions of dollars more that they could cash out at a later date.

39.    The Offering Materials were negligently prepared and, as a result, contained false and misleading statements of fact and failed to disclose facts necessary to render the statements made therein not false and misleading when made as detailed below.

40.    The Offering Materials highlighted the stunning growth in FSAM's AUM during the prior year, primarily due to the exponential growth of the Funds' investment portfolios, which had allowed FSAM to dramatically increase its fees in the lead up to the IPO.  For example, the Offering Materials stated that a "Key Competitive Strength[]" of FSAM was its "Strong Growth in Assets Under Management, Revenues and Earnings," purportedly as a result of FSAM's "outstanding performance."   The Offering Materials stated in pertinent part as follows:

> ***Strong Growth in Assets Under Management, Revenues and Earnings.*** *From December 31, 2010 to June 30, 2014, our AUM has increased by a compound annual growth rate, or CAGR, of 52.7%.*  We have increased AUM by organically growing our existing funds and developing profitable new funds and strategies.  From our inception we have generated outstanding performance for each asset class and fund we have advised.  ***This performance has helped***

*drive growth in our AUM, and as we have grown our AUM, our revenues have also increased in a consistent manner.  From 2010 to 2013, management fee revenues increased by a CAGR of 40.2%*.

41.     According to the Offering Materials,  AUM from FSC alone had ballooned to more than $4.2 billion by June 30, 2014.  Moreover, FSC's assets comprised about 90% of FSAM's AUM.  As a result, the Offering Materials stated that FSAM's management fees had increased from about $30 million in the first six months of calendar 2013 to about $45 million during the first six months of 2014, an increase of nearly 50% in a single year.

42.     The Offering Materials also stated that FSAM generated "[h]igh-[q]uality and [p]redictable [e]arnings" with "little . . . risk," stating in pertinent part:

> *High-Quality and Predictable Earnings. . . . Since a significant percentage of our revenues consist of management fees, our revenues are highly predictable*.  For the last 24 quarters and since the initial public offering in June 2008 of FSC, our largest fund, *FSC's net investment income has always exceeded both the 8% hurdle rate and the 10% catch-up provision. This performance is a consequence of our focus on credit strategies and funds, which generate fees that are more stable and less volatile than those of investment managers that are more equity-focused. The underlying portfolios of our strategies and funds are well diversified with little industry concentration risk*. No industry composes more than 15%, in the aggregate, of the portfolios of our funds as of June 30, 2014. In addition, approximately 99% of our total revenues in 2013 were generated from publicly traded permanent capital vehicles with unlimited duration. As we grow our existing investment vehicles and develop new funds and products, we expect that the contribution of revenues from non-permanent capital vehicles will increase in the future.

43.     The Offering Materials also stated that the following "[g]rowth . . . strategies will enable us to continue to grow our business":

- "*Continue to Grow our Existing Investment Vehicles.  We expect to continue to grow the AUM of our existing investment vehicles.* Alternative assets are experiencing increasing demand from a range of investors, which we and many industry participants believe is part of a long-term trend to enhance portfolio diversification and to meet desired return objectives. *We believe that our proven track record of outstanding investor performance and brand reputation will continue to attract new investments and capital to our funds. Our BDCs are particularly well-positioned to grow from the increasing retail interest in alternative investments*."

- 13 -

- "*Grow Direct Originations.  We believe we can meaningfully grow our originations to support the growth of our BDCs*, private funds and future products."

- "*Broaden our Product Offerings.*  We believe we are well-positioned to selectively leverage our established platform and brand to launch additional credit strategies and funds and continue growing as a diversified asset manager. *We have a proven record of organic growth and have demonstrated the ability to develop new and successful product offerings.*  These expanded offerings will benefit from our access to retail and institutional funding, management insight and strong sponsor relationships."

- "*Expand Funding Sources.*  We have demonstrated an ability to raise capital from a number of different funding sources, including retail and institutional shareholders in our permanent capital vehicles, bank credit facilities, institutional fund investors, high net worth individuals, family offices, Small Business Investment Company debentures, convertible debt, retail 'baby bonds,' unsecured senior institutional debt and separately managed accounts. . . . *Our new funds and strategies will be able to attract complementary sources of capital that did not previously have a place in the Fifth Street platform*, including senior agented deals, where we use our sponsor relationships to win, structure and underwrite senior facilities and distribute post-close, as well as structured equity where we see opportunities to provide solutions to sponsors at an attractive risk-adjusted return."

44.     In addition, the Offering Materials touted FSAM's management's purported

"[a]lign[ment] with [s]tockholders," stating in pertinent part:

> *Seasoned Management Team Aligned with Stockholders*. . . .  Our Principals have invested in our businesses and funds, aligning their interests with the performance of these vehicles. *Our Principals, including their affiliates, own approximately 1.5% of the equity of FSC and approximately 6.5% of the equity of FSFR, as of June 30, 2014. We expect that our executive officers will own approximately 87.0% of Fifth Street Holdings after this offering* (or approximately 85.2% if the underwriters exercise in full their option to purchase additional shares), *aligning their interests with those of our stockholders.* In connection with this offering, we are establishing a long-term equity compensation plan that we believe will strengthen this alignment, as well as the motivation and retention of our professionals, through the significant and long-term ownership of our equity by our executive officers, investment professionals and other key employees. We intend to award equity incentive compensation to over 90% of our employees.

45.     Similarly, the Offering Materials emphasized the fiduciary duties and obligations

that FSAM and its investment professionals owed to the Funds, stating in pertinent part:

- 14 -

*For example, the Advisers Act imposes numerous obligations on investment advisers, including record keeping, advertising and operating requirements, disclosure obligations and prohibitions on misleading or fraudulent activities. The Advisers Act also imposes an overriding fiduciary duty on investment advisers.* The 1940 Act imposes similar obligations on BDCs, as well as additional detailed operational requirements that must be strictly adhered to by their investment advisers and other service providers.

*     *     *

*Fifth Street Management and Fifth Street Capital LLC, the adviser of Fund II, are registered with the SEC as investment advisers pursuant to the Advisers Act, and our BDCs are regulated under the 1940 Act. As compared to other, more disclosure-oriented U.S. federal securities laws, the Advisers Act and the 1940 Act, together with the SEC's regulations and interpretations thereunder, are highly restrictive regulatory statutes.* The SEC is authorized to institute proceedings and impose sanctions for violations of the Advisers Act and the 1940 Act, ranging from fines and censures to termination of an adviser's registration.

*Under the Advisers Act, an investment adviser (whether or not registered under the Advisers Act) has fiduciary duties to its clients.* The SEC has interpreted these duties to impose standards, requirements and limitations on, among other things, trading for proprietary, personal and client accounts; allocations of investment opportunities among clients; use of "soft dollars," a practice that involves using client brokerage commissions to purchase research or other services that help managers make investment decisions; execution of transactions; and recommendations to clients.

46.     The Offering Materials further highlighted FSAM's purported "culture of compliance," extensive internal controls and processes to mitigate and prevent wrongdoing, and adherence to Fifth Street's Code of Business Conduct and Ethics and Code of Ethics:

*Rigorous legal and compliance analysis of our businesses and investments is important to our culture. We strive to maintain a culture of compliance through the use of policies and procedures, such as oversight compliance, codes of ethics, compliance systems, communication of compliance guidance and employee education and training.* We have a compliance group that monitors our compliance with the regulatory requirements to which we are subject and manages our compliance policies and procedures. Our Chief Compliance Officer supervises our compliance group, which is responsible for monitoring all regulatory and compliance matters that affect our activities. Our compliance policies and procedures address a variety of regulatory and compliance risks, such as the handling of material, non-public information, personal securities trading, document retention, potential conflicts of interest and the allocation of investment opportunities. *Senior management is involved at*

*various levels in all of these functions, including through active participation on oversight and credit committees*.

47.     Similarly, the Offering Materials touted FSAM's "*mission . . . to be admired in the marketplace for our ideas, talent and integrity*," and stated that FSAM "*foster[s] a culture of dedicated and innovative professionals who strive to deliver impeccable service and create value for both our investors and our clients*."

48.     The statements in ¶¶40-47 in the Offering Materials were false and misleading when made, because they failed to disclose the following adverse facts:

(a)     That FSC's investments in JTC, Phoenix and TransTrade were impaired and should have been placed on non-accrual;

(b)     That, as a result of (a), FSC's net investment income could not cover the 10% dividend increase FSC had previously announced and the dividend increase had no reasonable basis;

(c)     That defendants had grown FSAM's AUM throughout 2014 in part by delaying the write-down of impaired investments in FSC's portfolio and improperly recognizing revenue for FSAM's investment activities, and thus such growth was not "organic" or attributable to "outstanding performance" by FSAM but due to short-term, non-sustainable events;

(d)     That FSC had a material weakness in its controls over financial reporting; and

(e)     That, as a result of (a)-(c), FSAM had invested the Funds' assets in a manner detrimental to the Funds' shareholders, which had impaired its ability to continue to grow its AUM and generate additional fee income and had put FSAM's most important asset – its advisory contract with FSC – at risk.

49.     Furthermore, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), requires the Registration Statement to describe "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."   17 C.F.R. §229.303(a)(3)(ii). Similarly, the regulation requires the Registration Statement to disclose events that the registrant knew would "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected." 17 C.F.R. §299.303(a)(3)(i), (ii).

50.     Defendants violated Item 303 by failing to disclose in the Registration Statement that a substantial portion of FSC's debt portfolio consisted of non-performing or at risk loans and that FSAM had grown its AUM in part by delaying the write-down of impaired assets and improperly recognizing income, as the underperformance of FSC's loans and the true reasons for FSAM's growth in AUM were events and uncertainties that would (and did) have a materially adverse impact on FSAM's revenues and income from operations.

51.     On October 29, 2014, FSAM announced the pricing of its IPO at $17 per share. At this offering price, defendant Tannenbaum and his associates stood to receive over $100 million in gross proceeds from the IPO, while several of the Individual Defendants received ownership interests worth hundreds of millions of dollars more.  For example, at the IPO price of $17 per share, defendant Tannenbaum's ownership interest was valued at over $683 million, defendant Berman's ownership interest was valued at over $44 million, defendant Frank's ownership interest was valued at $1.8 million, and defendant Noreika's ownership interest was valued at over $78,000.

52.     That same day, *Bloomberg Business* published an article about the FSAM IPO entitled "Fifth Street Tries Again with Scaled Back IPO."  The article detailed how defendant Tannenbaum would be richly rewarded in the offering, stating in pertinent part:

> Fifth Street Asset Management Inc., which pulled its initial public offering a week ago as stock markets tumbled, filed for the sale again with a target that's half what it originally sought.

> \*          \*          \*

> The company, which was initially scheduled to price its IPO on Oct. 21, said the next day that it was scrapping the deal and that it would withdraw its registration statement.  Signaling a recovery in demand, the asset manager amended its original filing yesterday to seek $102 million, offering 6 million shares at $17 apiece.

> \*          \*          \*

> ***Leonard M. Tannenbaum, the founder and chief executive officer of Fifth Street, was set to become one of the world's youngest billionaires at the original price range.  With yesterday's haircut, his stake is worth about $683.5 million, according to the company's prospectus.***

53.     On November 4, 2014, FSAM announced the closing of its IPO, which generated $102 million in proceeds.

54.     Then, on February 9, 2015, FSC issued a press release announcing its financial results for its fiscal 2015 first quarter, ended December 31, 2014 – the same quarter in which the IPO was conducted.  FSC revealed that it had recorded a staggering $62 million depreciation on its debt and equity investments during the quarter, while its quarterly net realized losses exceed $17.6 million.  FSC also revealed that four of its investments had all been placed on non-accrual status during the quarter including JTC, Phoenix and TransTrade, and that a fifth would likely be placed on non-accrual the subsequent quarter.  ***These five investments totaled $122.8 million at cost, or nearly 5% of FSC's entire debt portfolio.***  As a further indication of the rapid deterioration in the quality of FSC's portfolio, FSC stated its total assets had increased to $2.9 billion at quarter end, which represented a more than 20% increase compared to the total assets

at the end of the corresponding quarter the prior fiscal year, yet its net investment income had actually **decreased** by 3% compared to that quarter.  At only $0.23 in net investment income per share, FSC fell woefully short of covering its $0.28 per share quarterly dividend declared prior to the IPO and was forced to record an earnings per share ("EPS") loss of $0.20.  Symptomatic of FSC's bleak prospects, FSC stated that it would pay no dividend at all for February 2015, and would slash future dividends by 30% in subsequent months as part of a more "conservative" dividend policy.

55.     That same day, FSC hosted a conference call to discuss the disappointing earnings results.  On the call, one analyst questioned FSC's ability to originate new investment going forward given that FSC's debt-to-equity ratio was then pushing above the high end of its pre-announced target range.  This same analyst later expressed "**surprise[]**" to see all of FSC's "**unrealized and realized losses, both in magnitude and number of investments**."  Another analyst stated that it "**does not make sense**" to have "a fee structure that allows the manager to be paid more annually despite net share declines and dividend declines" to shareholders.  Yet another analyst asked for help in understanding "what has changed in the financial planning or in the environment over the last six months to now decrease the dividend," given that FSC had just "increased the core dividend in August."

56.     On February 23, 2015, Fitch, one of the nation's major ratings agencies, issued a press release announcing that it was downgrading FSC to BB+ from BBB- on a negative outlook.  As Fitch explained, FSC was operating at 0.99x leverage which was far above the 0.61x average leverage for its investment-grade peers as of September 30, 2014.  The release also stated that the increased leverage had come at a time when FSAM had shifted FSC into riskier assets while FSC's inconsistent dividend policy had likely cost it "credibility with equity investors."  The release stated in pertinent part:

*The rating downgrade reflects FSC's higher leverage levels, combined with increased portfolio risk, an inconsistent dividend policy, material portfolio growth in a very competitive underwriting environment, asset quality deterioration, and weaker operating performance*.

During 2014, FSC increased the upper-bound of its long-term leverage target from 0.7 times (x) to 0.8x, excluding SBA debt, which is exempt from regulatory asset coverage calculations, but is included in Fitch's assessment of FSC's leverage.  Including SBA debt in FSC's leverage calculation translates to total leverage tolerance of 0.96x.  Fitch views the increased leverage target as aggressive, particularly given the portfolio shift into second lien securities and increased use of leveraged off-balance sheet vehicles, including the senior loan fund (SLF) and Healthcare Finance Group LLC (HFG).

Furthermore, regulatory leverage exceeded the company's new limit in three of the last four quarters, and amounted to 0.83x at Dec. 31, 2014, or 0.99x including SBA debt.  This compares to 0.61x average leverage for investment grade-rated peers as of Sept. 30, 2014.

*On Feb. 20, 2015, FSC's stock was trading at a 21.3% discount to net asset value, which is likely to restrict the firm from accessing the equity markets for some time.  As a result, cash generated from portfolio repayments and sales will be needed to reduce leverage, which could constrain FSC's ability to take advantage of investment opportunities, relative to the peer group*.

*The increased leverage target comes as FSC's investment portfolio has gradually shifted into riskier assets, in Fitch's view*.  Although FSC remains a senior lender with 55.9% of the portfolio invested in first lien positions, at Dec. 31, 2014, this is down from 70.1% at Sept. 30, 2012.  Fitch also calculates an adjusted measure of first lien exposure, converting investments recorded as loans to HFG and First Star Aviation to equity, as FSC wholly owns those companies and is in a first-loss position.  On this basis, as of Dec. 31, 2014, Fitch calculates that FSC's first lien and equity exposures stood at 49.9% and 15.9% of the portfolio, respectively.

While positions in HFG and the SLF represent investments in diversified pools of loans, they are akin to equity investments in lowly-levered CLOs, which incrementally alters the firm's risk profile.  Management has articulated its intention to grow the SLF and/or add similar programs as an important driver of earnings growth, which combined with an elevated leverage tolerance, is viewed by Fitch as consistent with a below investment grade credit profile.

FSC announced a steep (34.5%) dividend cut in February 2015, citing a slower-than-expected ramp of the SLF and reduced fee expectations, given more limited capital available for growth.  The dividend cut followed a 10% increase in the dividend in July 2014; above run-rate core earnings, which was viewed as aggressive by Fitch in the face of a still challenging yield spread environment and unsustainable non-accrual levels.  In November 2013, FSC cut its dividend 13%, a move that was deemed prudent by Fitch.  *The inconsistent dividend policy*

*speaks to poor financial planning and has likely cost the firm some credibility with equity investors; an important source of growth capital*.

FSC's investment portfolio grew 49.6% in 2013, followed by 17.9% additional expansion in 2014. Fitch remains cautious of outsized portfolio growth in the current credit environment, which is generally characterized by tighter yield spreads, higher underlying portfolio company leverage, and weaker covenant packages. Fitch believes significant exposure to more recent vintages could yield outsized asset quality issues down the road.

While Fitch believes industrywide credit metrics are at unsustainable levels longer term, *FSC did stand-out in the fourth quarter of 2014; moving four investments to non-accrual status, with one more expected in the first quarter of 2015*. Non-accruals accounted for 4.03% of the portfolio at cost, and 2.33% at fair value, as of Dec. 31, 2014, compared with the investment grade peer average of 0.90% at cost, and 0.55% at fair value, as of Sept. 30, 2014. FSC recorded a $17.6 million realized loss and additional $48.2 million in unrealized losses, which reduced book value by 2.6% and inflated leverage by 0.04x.

57.     On March 30, 2015, FSAM filed its fiscal results for the fourth quarter and full-year ended December 31, 2014 on Form 10-K. The Form 10-K revealed that in December 2014, FSAM had paid $80,000 for a membership interest in IMME LLC ("IMME"), a limited liability company with the purported purpose of "develop[ing] technology related to the financial services industry" *that was co-owned by defendant Tannenbaum's brother*. The Form 10-K also revealed that FSAM had purchased a convertible promissory note from IMME for $800,000. In addition, the Form 10-K stated that FSAM would not be providing "management's assessment regarding internal control over financial reporting or an attestation report of our independent registered public accounting firm due to a transition period established by rules of the SEC for newly public companies."

58.     On April 16, 2015, *Bloomberg Business* published an article detailing defendant Tannenbaum's use of his Fifth Street enterprise to generate millions of dollars for himself, entitled "Tannenbaum's Fifth Street Funds Yield 10% by Lending Alongside Private Equity." The article described how defendant Tannenbaum had set up FSC as a "mousetrap" designed "'to make money'" for himself. The article also described how defendant Tannenbaum had

purposefully used complexity to obscure the true value of FSC's investment portfolio from investors and the market, and how he had used insider knowledge of asset write-downs at FSC in order to short BDCs holding those same assets to profit his privately held hedge fund.  The article stated in pertinent part:

> When Leonard Tannenbaum set up shop in the basement of an office building in Mount Kisco, New York, his plan for his one-man investing business was about as basic as you can get.  "*Early on, the idea was to make money,*" *Tannenbaum says.* "*How do I make money? How do I get an edge?*"
>
> It was 1998, and he was 27 years old, a Wharton MBA with two years as an analyst at Merrill Lynch and a couple of stints at fund firms, *Bloomberg Markets* reports in its May issue.  He even sublet out half of the 800-square-foot (74-square-meter) space.  *Tannenbaum asked himself: "Is there a better mousetrap to develop?*"
>
> *The mousetrap Tannenbaum built almost made him a billionaire last year.  When the initial public offering of Fifth Street Asset Management was being marketed at $24 to $26 a share, Tannenbaum's stake in the company would have been worth more than $1 billion at the upper end of the initial range.*
>
> Amid market turbulence in October, though, the stock sale was pulled.  Refiled, the offering priced at $17, and shares began trading on Oct. 30.  "We got two-thirds of the way there," Tannenbaum, 43, says. On April 16, the stock traded at $11.09, making his 40.2 million Class B shares worth $446 million.
>
> Now headquartered in a 120,000-square-foot, light-filled building in Greenwich, Connecticut, Fifth Street manages more than $6 billion altogether.  Its vehicles include a $70 million long-short credit hedge fund, a private senior loan fund, and a $309 million collateralized loan obligation.  Most of the firm's assets, though, are in two publicly traded business development companies: Fifth Street Finance Corp. and Fifth Street Senior Floating Rate Corp.
>
>                *       *       *
>
> Tannenbaum says he realized early on that he could get an edge by investing alongside private equity firms because they essentially provide a credit enhancement.  To raise a new fund, sponsors typically want to avoid a big loss in the previous vehicle.  "So there's a willingness and ability of a private equity firm to re-up at a problem," he says.
>
> *Tannenbaum says that the complexity and sheer number of investments make it unlikely that busy Wall Street analysts – let alone retail investors – can analyze all of a BDC's holdings.  That provides another opportunity for an*

*edge, he says.  "Knowing your industry, knowing your assets, knowing what's
going on in the middle market – you can take advantage of that," he says.*

> That's what Tannenbaum did recently in the firm's hedge fund, he says.
> Started two years ago, Fifth Street Opportunities Fund gained 11.3 percent in
> 2013 and 9.6 percent in 2014, according to a fund letter obtained by Bloomberg.

> *When FSC wrote down an investment to 40 percent of face value in
> February, Tannenbaum knew that a couple of other BDCs had pieces of the
> same loan still carried at higher values, he says.  "So there's your edge: In the
> hedge fund, I can trade those things knowing how retail is going to respond to
> them," Tannenbaum says. "We took advantage of it by shorting some of our
> competitors*."

59.    On May 11, 2015, FSC issued a press release announcing its financial results for

its fiscal 2015 second quarter, ended March 31, 2015, demonstrating that FSC's investment

income and business fundamentals had continued to deteriorate, which negatively impacted

FSAM's ability to generate fee income.  FSC reported net investment income of $29.5 million,

or $0.19 per share, a decrease of 16% from the prior quarter and a decrease of more than 25% as

compared to the quarter leading up to the IPO, and diluted EPS of ($0.17).  In addition, FSC's

quarterly fee income had plummeted from $17.9 million the prior quarter to just $5.7 million,

which indicated that FSC had run into difficulties generating the liquidity needed to fund new

investments or generate additional income going forward.

60.    On the conference call to discuss the quarterly results, one analyst became

palpably frustrated with FSC's failure to offer a favorable return to shareholders:

> *But the income as a shareholder just hasn't been there – there's no two
> ways about it.  It just hasn't been there*.  The growth has not translated to
> shareholder value.  More senior assets has not translated to more income because
> of the high fees.

*       *       *

> *And first of all, why with [sic] the shareholder allow you to grow, i.e. put your
> stock price above book value given the past performance?*  It's kind of a chicken
> and the egg.  You have to do something for the shareholder to ever be allowed to
> grow in my opinion.  *And yet there is not going to be in the shareholder benefit,
> only on incremental growth.  So how does the Board view that? How do you*

- 23 -

*view that? There's no benefit for the shareholder in changing the fees on incremental growth?*

Later on the call, another analyst focused on FSAM's prior conduct as eroding the "trust" between management and FSC's shareholders.

61.     On May 15, 2015, FSAM announced its financial results for its fiscal 2015 first quarter, ended March 31, 2015.  The release stated that FSAM's net income for the quarter was $9.3 million (or $0.19 per share), which represented a 28% decline from the prior quarter, even as FSAM's AUM continued to increase.  Meanwhile, FSAM's net expenses had continued to increase to $9.8 million "due primarily to increases in employee costs."

62.     A June 30, 2015 analyst report by Cantor Fitzgerald noted that FSC had the weakest credit quality among its peers, with a nonperforming loan ratio of 4.0% on a cost basis compared to 1.2% among its peer group.

63.     On July 14, 2015, FSC announced that FSAM had agreed to a waiver to reduce its base management fees relating to issuances of new equity.

64.     On August 13, 2015, FSAM issued a press release announcing its results for the quarter ended June 30, 2015.   The release stated that FSAM had earned $9.3 million in net income for the quarter (or $0.19 per share), which represented a greater than 10% decrease for the six months ended June  30, 2015 year-over-year.  FSC's AUM, meanwhile, had decreased from approximately $4.1 billion at the beginning of the quarter to approximately $2.9 billion by quarter end, a decline of nearly 30%, due to the disposition of assets.

65.     On November 16, 2015, RiverNorth, which claims to be FSC's largest shareholder, issued letters to FSC's board of directors and to its shareholders calling for the termination of FSC's advisory agreement with FSAM.  The letter to shareholders stated in pertinent part:

It is clear to us that the market has lost confidence in the Board and the External Manager, as illustrated by the Company's 34% discount to book value. It is extremely troubling that while the External Manager has handsomely profited from aggressive portfolio growth and exorbitant fees, stockholders have suffered greatly under precipitously declining performance. Despite this, the Board has been reluctant to make any significant changes.

*     *     *

Appalling Historical Performance

Since inception (6/11/08) – and over almost any measurement period since – <u>FSC has woefully underperformed all relevant benchmarks</u>. Total returns are benchmarked to FSC's IPO on 6/11/08 and are current through 10/30/15.

*     *     *

Deeply Troubling Misalignment of Interests

Between June 30, 2008 and June 30, 2015 (FSC's most recent reporting period), the External Manager has been paid cumulative base and incentive management fees in the aggregate of $334.7 million. During this time period, the book value has declined from $13.20 to $9.13 per share. While the Company's book value per share has declined 31% since June 30, 2008, the quarterly fees paid to the External Manager have increased 6.3 times (see chart below). In the past twelve months alone (through 6/30/15), the External Manager has charged the Company's stockholders base and incentive fees totaling $85.4 million. We believe it is clear that the External Manager has benefited from running a larger portfolio while stockholders have suffered from uneconomic growth. The declining book value, net investment income and distributions per share demonstrate this troubling discrepancy. The Company has raised about $1.5 billion in gross proceeds since inception and the External Manager has made a fortune charging FSC stockholders to generate return-free risk.

*     *     *

In addition to paying the External Manager high fees for uneconomic growth that has not resulted in stockholder value creation, the incentive fee structure of the Company does not hold the External Manager accountable for credit losses. The incentive fee is paid on NII, not total return. The External Manager charges stockholders an incentive fee on interest income received, even if the loans that generate the interest income result in credit losses. Since inception, the Company has accumulated net realized and unrealized losses of roughly $230 million, including $91 million since 6/30/14. As a "reward" for its performance, the External Manager has charged the Company's stockholders cumulative incentive fees of $147 million. Why are stockholders paying an NII incentive fee while the External Manager is racking up credit losses? Stockholders need an alignment of interests. The industry best practice is to apply a total return high watermark to the NII incentive fee calculation. Without this

safeguard, the External Manager has an incentive to reach for yield at the expense of credit quality.

*        *        *

<u>Failure to Enact Real Strategic Change</u>

Measured by market price to book value, FSC has one of the lowest valuations in the industry. Looking at the roughly 50 publicly traded income BDCs, the market cap weighted average discount to book value is roughly 11%. At the close on November 13, 2015, the market price of the Company was 34% below book value. There is no other BDC with a market capitalization greater than $500 million with a lower price to book valuation.

*        *        *

We are steadfast in our belief that stockholder-friendly perspectives and increased independence on the Board are required to ensure improved performance and increased management accountability. Furthermore, we believe the External Manager should be held accountable for its poor performance and misaligned interests. We will ask stockholders to vote to terminate the investment advisory agreement, unless dramatic and sweeping changes are made now.

(Footnote omitted, emphasis in original and deleted.)

66.     On November 17, 2015, FSAM filed a notice on Form NT that it would be unable to timely file its financial results for the quarter ended September 30, 2015.

67.     On November 23, 2015, FSAM issued a press release announcing its results for the quarter ended September 30, 2015.  The release disclosed that a wholly-owned subsidiary of FSAM had improperly recognized income from certain loan originations at the Funds, and as a result the Funds had paid FSAM $3.3 million in fees prematurely.   Following the release, an analyst report from J.P. Morgan advised investors to "avoid the stock as we have little comfort" FSAM would be able to maintain its advisory agreement with FSC in light of the challenge by RiverNorth.   Another analyst report by Wells Fargo described FSAM as a company in "free fall."

68.     On December 1, 2015, FSC filed its fiscal results for the quarter and year ended September 30, 2015 on Form 10-K.  The Form 10-K disclosed that FSC had discovered a

material weakness in its internal controls over financial reporting "related to not having the appropriate design or not properly maintaining effective controls to internally communicate current accounting policies and procedures including the nature of supporting documentation required necessary to validate certain portfolio company data." The Form 10-K also disclosed accounting errors that had caused FSC to overstate its investment income, including by a cumulative $8.5 million around the time of the IPO, as well as its payments to FSAM.   The Form 10-K stated in pertinent part:

> During the three months ended September 30, 2015, the Company identified errors in the recognition of fee income from fiscal years ended 2012 through 2015, as well as the consolidation of First Star holding companies in 2015. The errors primarily related to recognizing fee income at deal close when the amounts did not represent a separately identifiable revenue stream and instead were more related to underwriting the investment. ***These errors mainly affected the timing of when income should be recognized and were partially offset by the overpayment of Part I Fees paid to FSM.*** The Company assessed the materiality of the errors on its prior quarterly and annual financial statements, assessing materiality both quantitatively and qualitatively, in accordance with the SEC's Staff Accounting Bulletin ("SAB") No. 99 and SAB No. 108 and concluded that the errors were not material to any of its previously issued financial statements. ***The cumulative adjustment as of September 30, 2014 was a reduction of $8.5 million of fee income*** partially offset by a $3.6 million increase to interest income and ***a $1.0 million decrease to the incentive fee payable to FSM***, resulting in a $3.9 million reduction to net investment income. Further, a $4.8 million increase in unrealized/realized appreciation (depreciation) was recorded. These items were recorded as out-of-period adjustments for the three months ended December 31, 2014. The impact on net assets for these entries was an increase of $1.0 million. Refer to Note 16 for more detail on the revised quarterly information for fiscal year 2015.

The Form 10-K also revealed that the termination of the investment advisory agreement with FSAM could lead to an "event of default" with FSC's creditors.

69.     That same day, FSC filed a notice on Form NT that it had been unable to file its annual results by the prescribed deadline of November 30, 2015, due in part to the material weaknesses in FSC's controls over financial reporting.

70.     Also on December 1, 2015, FSC held an earnings conference call to discuss the results and recent developments.  On the call, defendant Noreika revealed that the accounting problems went back to 2012, before the IPO.  Analysts reacted with surprise, with one asking how the problem could have gotten missed for so long given that it "goes back several years and has gotten past the orders as before."  Another analyst commented that RiverNorth's letter raised "pretty much statements of fact" as to problems at FSC.  Still another criticized management for "only taking questions from analysts and not your shareholders . . . .  I think that's a very poor decision."

71.     On December 7, 2015, FSAM filed a Form 8-K announcing the resignation of defendant Gordan and another FSAM director, David J. Anderson ("Anderson").  Gordon and Anderson had both been appointed to FSAM's Corporate Governance Committee upon the resignation of another purportedly independent director, defendant Meyer, in August.   As a result, all of FSAM's purportedly independent directors on its Corporate Governance Committee had resigned in a span of three-and-a-half months, leaving defendant Tannenbaum as the committee's sole member.

72.     On December 9, 2015, FSAM stock closed at $4.03 per share, ***more than 76% below the IPO price***.

## CLASS ACTION ALLEGATIONS

73.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased FSAM stock in or traceable to FSAM's IPO (the "Class").  Excluded from the Class are defendants and their families, the officers and directors of Fifth Street, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

74.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  FSAM has 48.6 million shares of common stock outstanding, and thus is likely owned by hundreds if not thousands of persons.

75.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

    (a)     Whether the 1933 Act was violated by defendants;

    (b)     Whether defendants omitted and/or misrepresented material facts;

    (c)     Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and

    (d)     The extent of damage sustained by Class members and the appropriate measure of damages.

76.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

77.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

78.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §11 of the 1933 Act
### Against All Defendants

79.     Plaintiff incorporates ¶¶1-78 by reference.

- 29 -

80.     The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

81.     Defendant FSAM is the registrant for the Registration Statement. The Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

82.     As the issuer of the Registration Statement, FSAM is strictly liable to plaintiff for the misstatements and omissions.

83.     None of the Individual Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

84.     By reasons of the conduct alleged herein, defendants violated, and/or controlled a person who violated, §11 of the 1933 Act.

85.     Plaintiff acquired FSAM common stock pursuant to the Registration Statement.

86.     Plaintiff has sustained damages.  The value of the FSAM common stock purchased by Plaintiff has declined substantially subsequent to and due to the defendants' violations.

## COUNT II

### For Violation of §12(a)(2) of the 1933 Act
### Against FSAM

87.     Plaintiff incorporates ¶¶1-86 by reference.

88.     FSAM was a seller and offeror and/or solicitor of purchasers of the FSAM common stock sold pursuant to the Prospectus.

89.     The Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material

facts required to be stated therein.  FSAM's actions of solicitation included participating in the preparation of the false and misleading Prospectus.

90.     FSAM owed to the purchasers of the FSAM common stock sold in the IPO, including plaintiff, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  FSAM, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

91.     Plaintiff purchased FSAM common stock pursuant and/or traceable to the Prospectus.  Plaintiff did not know, nor in the exercise of reasonable diligence could plaintiff have known, of the untruths and omissions contained in the Prospectus.

92.     By reason of the conduct alleged herein, FSAM violated, and/or controlled a person who violated, §12(a)(2) of the 1933 Act.  Accordingly, plaintiff has the right to rescind and recover the consideration paid for plaintiff's FSAM common stock and hereby elects to rescind and tender plaintiff's FSAM common stock to FSAM.  Plaintiff is entitled to rescissory damages for the FSAM common stock that has been sold.

### COUNT III

**For Violations of §15 of the 1933 Act**
**Against All Defendants**

93.     Plaintiff incorporates ¶¶1-92 by reference.

94.     Each of the Individual Defendants acted as a controlling person of FSAM within the meaning of §15 of the 1933 Act by virtue of his control of or position as a director and/or senior officer at FSAM.  By reason of FSAM's control over the senior management positions and/or directorships of the Individual Defendants, as alleged above, FSAM and the Individual Defendants, individually and acting pursuant to a common plan, had the power to influence and

exercised the same to cause the conduct complained of herein.  By reason of such conduct, FSAM and the Individual Defendants are liable pursuant to §15 of the 1933 Act.

95.     Each of the Individual Defendants and FSAM was a culpable participant in the violations of §§11 and/or 12(a)(2) of the 1933 Act alleged above, based on their having signed or authorized the signing of the Registration Statement or having otherwise participated in the process that allowed the IPO to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as a Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding plaintiff and the members of the Class damages, including interest;

C.     Awarding rescission or a rescissory measure of damages;

D.     Awarding plaintiff's reasonable costs and attorneys' fees; and

E.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  January 7, 2016                    DISERIO MARTIN O'CONNOR
                                           & CASTIGLIONI LLP
                                           JONATHAN P. WHITCOMB (ct15014)


                                           _____
                                                */s/ Jonathan P. Whitcomb*
                                           JONATHAN P. WHITCOMB

DISERIO MARTIN O'CONNOR
& CASTIGLIONI LLP
One Atlantic Street
Stamford, CT 06901
Telephone: 203/358-0800
203/348-2321 (fax)

HOLZER & HOLZER, LLC
COREY D. HOLZER
1200 Ashwood Parkway, Suite 410
Atlanta, GA  30338
Telephone:  770/392-0090
770/392-0029 (fax)

Attorneys for Plaintiffs

**CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS**

The undersigned declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the initial complaint filed in this action.

Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost/Share |
|---|---|---|---|
| FSAM | *SEE ATTACHED CONFIRMS (6+10)* | | |

Sales:

| Name of Company | Date(s) Sold | # Shares Sold | Proceeds/Share |
|---|---|---|---|
| FSAM | *SEE ATTACHED CONFIRMS (9+7)* | | |

*NOTE: ALL SALES DONE ON FIFO BASIS FOR EACH ENTITY*

During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):   *NONE*

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _24_ day of _DEC._, 2015 in _PARADISE VALLEY_   _ARIZONA_.
                                                City                    State

(Signature) X _____

(Print Name) _RONALD K. LINDE_

MAXINE H. LINDE
THE RONALD AND MAXINE LINDE
                        FOUNDATION

by: RONALD K. LINDE
    CHAIRMAN AND TREASURER

# PURCHASES

| DATE | NAME | NUMBER SHARES | PRICE PER SHARE |
|---|---|---|---|
| 10/29/2014 | Ronald and Maxine Linde | 850 | 17.00 |
| 10/30/2014 | Ronald and Maxine Linde | 500 | 14.02 |
| 10/30/2014 | Ronald and Maxine Linde | 500 | 14.52 |
| 10/30/2014 | Ronald and Maxine Linde | 1,000 | 15.02 |
| 12/9/2014 | Ronald and Maxine Linde | 1,000 | 13.02 |
| 3/10/2015 | Ronald and Maxine Linde | 1,150 | 11.70 |
| 5/7/2015 | Ronald and Maxine Linde | 400 | 10.56 |
| 5/13/2015 | Ronald and Maxine Linde | 600 | 10.59 |
| 10/29/2014 | The Ronald and Maxine Linde Foundation | 850 | 17.00 |
| 10/30/2014 | The Ronald and Maxine Linde Foundation | 500 | 14.02 |
| 10/30/2014 | The Ronald and Maxine Linde Foundation | 500 | 14.52 |
| 10/30/2014 | The Ronald and Maxine Linde Foundation | 1,000 | 15.02 |
| 12/9/2014 | The Ronald and Maxine Linde Foundation | 1,000 | 13.02 |
| 3/10/2015 | The Ronald and Maxine Linde Foundation | 1,150 | 11.70 |
| 5/7/2015 | The Ronald and Maxine Linde Foundation | 413 | 10.56 |
| 5/13/2015 | The Ronald and Maxine Linde Foundation | 587 | 10.59 |
| 10/28/2015 | The Ronald and Maxine Linde Foundation | 2,000 | 6.45 |
| 10/29/2015 | The Ronald and Maxine Linde Foundation | 3,000 | 6.1667 |
| 10/30/2015 | The Ronald and Maxine Linde Foundation | 1,250 | 5.98 |
| 11/2/2015 | The Ronald and Maxine Linde Foundation | 750 | 5.82 |

# SALES

| DATE | NAME | NUMBER SHARES | PRICE PER SHARE |
|---|---|---|---|
| 10/16/2015 | Ronald and Maxine Linde | 850 | 7.3362 |
| 10/16/2015 | Ronald and Maxine Linde | 1,000 | 7.25 |
| 10/20/2015 | Ronald and Maxine Linde | 260 | 7.26 |
| 10/20/2015 | Ronald and Maxine Linde | 500 | 7.25 |
| 10/23/2015 | Ronald and Maxine Linde | 240 | 7.1533 |
| 11/17/2015 | Ronald and Maxine Linde | 1,000 | 5.925 |
| 11/17/2015 | Ronald and Maxine Linde | 1,150 | 5.744 |
| 11/17/2015 | Ronald and Maxine Linde | 400 | 5.5425 |
| 11/17/2015 | Ronald and Maxine Linde | 600 | 5.59 |
| 11/17/2015 | The Ronald and Maxine Linde Foundation | 6,000 | 4.7462 |
| 11/17/2015 | The Ronald and Maxine Linde Foundation | 1,000 | 5.01 |
| 11/17/2015 | The Ronald and Maxine Linde Foundation | 1,000 | 4.7301 |
| 11/17/2015 | The Ronald and Maxine Linde Foundation | 500 | 5.07 |
| 11/17/2015 | The Ronald and Maxine Linde Foundation | 2,500 | 5.07 |
| 11/17/2015 | The Ronald and Maxine Linde Foundation | 1,250 | 5.22 |
| 11/17/2015 | The Ronald and Maxine Linde Foundation | 750 | 5.22 |