**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RONALD K. LINDE, MAXINE H. LINDE, THE RONALD AND MAXINE LINDE FOUNDATION, Individually and On Behalf of All Others Similarly Situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>FIFTH STREET ASSET MANAGEMENT INC., LEONARD M. TANNENBAUM, BERNARD D. BERMAN, ALEXANDER C. FRANK, STEVEN M. NOREIKA, WAYNE COOPER, MARK J. GORDON, THOMAS L. HARRISON and FRANK C. MEYER,<br><br>    Defendants. | Case No. 1:16-cv-01941-LAK<br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS**
**OF THE FEDERAL SECURITIES LAWS**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     INTRODUCTION ....................................................................................... 1

II.    JURISDICTION AND VENUE ................................................................. 4

III.   PARTIES ................................................................................................... 5

IV.   BACKGROUND ....................................................................................... 6

     A.    The Fifth Street Group of Companies ....................................................6

     B.    Fifth Street Executives, Including Many of the Individual Defendants, Held Positions at Numerous of the Fifth Street Entities ....................................................8

     C.    Fifth Street's Business Development Companies ................................................10

          1.    FSAM's Advisory Contracts with the Fifth Street BDCs .........................11

          2.    FSAM's Base Management Fees ...........................................................12

          3.    FSAM's Part I Fees .............................................................................13

          4.    FSAM's Part II Fees ...........................................................................14

     D.    Fifth Street's Campaign to Increase the AUM of FSAM Prior to the IPO ............15

V.    FSAM'S AUM AND FEES WERE OVERSTATED BY FSC'S FAILURE TO TIMELY STOP THE IMPROPER ACCRUAL OF INTEREST ON CERTAIN OF ITS INVESTMENTS AND FSC'S INFLATION OF THE VALUE OF ITS ASSETS .. 16

     A.    Accounting Guidelines for the Accrual of Interest and the Fair Market Value of Investments ....................................................17

     B.    FSC Overstated Income from and Misrepresented the Fair Value of Its Loan to TransTrade by Failing to Put It on Non-Accrual Prior to the IPO ...................19

     C.    FSC Overstated Income from and Misrepresented the Fair Value of Its Loan to CCCG by Failing to Put It on Non-Accrual Prior to the IPO ..........................23

     D.    FSC Overstated Income from and Misrepresented the Fair Value of Its Loan to Phoenix by Failing to Put It on Non-Accrual Prior to the IPO .........................25

     E.    FSC Overstated Income from and Misrepresented the Fair Value of Its Loan to JTC by Failing to Put It on Non-Accrual Prior to the IPO ...............................26

F.      FSAM's Net Income Was Overstated Due to Improper Recognition of Interest Income ......................................................................................26

VI.    DEFENDANTS HAVE ADMITTED THAT FSAM'S FEES WERE OVERSTATED AT THE TIME OF THE IPO ................................................ 28

VII.   THE REGISTRATION STATEMENT AND IPO ............................................ 30

VIII.  THE REGISTRATION STATEMENT CONTAINED MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND/OR OMITTED MATERIAL INFORMATION REQUIRED TO BE STATED THEREIN ......................... 32

IX.    POST-IPO DISCLOSURES ............................................................. 37

X.     NO SAFE HARBOR ........................................................................ 53

XI.    CLASS ACTION ALLEGATIONS ................................................... 53

XII.   COUNTS .................................................................................... 55

       A.      COUNT I: For Violations of Section 11 of the Securities Act (Against All Defendants) ......................................................................55

       B.      COUNT II:  For Violations of Section 12(a)(2) of the Securities Act (Against All Defendants) ..............................................................56

       C.      COUNT III: For Violations of Section 15 of the Securities Act (Against the Individual Defendants) ...............................................57

XIII.  PRAYER FOR RELIEF ................................................................ 58

XIV.   JURY TRIAL DEMAND ............................................................... 59

Lead Plaintiffs Kieran Duffy and Susan Duffy ("Plaintiffs"), by their undersigned attorneys, allege the following based upon the investigation conducted by Plaintiffs' counsel. The investigation included, among other things, a review of United States Securities and Exchange Commission ("SEC") filings by Fifth Street Asset Management, Inc. ("FSAM" or the "Company"), Fifth Street Finance Corp. ("FSC"), and Fifth Street Senior Floating Rate Corp. ("FSFR") (collectively, "Fifth Street"), as well as regulatory filings and reports; securities analysts' reports and advisories about Fifth Street; press releases, earnings calls, and other public statements issued by Fifth Street; media reports about Fifth Street; and investigative interviews with persons having first-hand knowledge of the facts alleged herein. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   INTRODUCTION

1.      This is a class action on behalf of all persons and/or entities who purchased or otherwise acquired common stock of FSAM pursuant and/or traceable to the Registration Statement and Prospectus[1] issued in connection with the Company's initial public offering ("IPO") on or about October 29, 2014, seeking to pursue remedies under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act").

2.      Fifth Street was founded in 1998 by Defendant Leonard M. Tannenbaum ("Tannenbaum") as an asset management company specializing in investing in small- and mid-sized companies. Over the next decade, Defendant Tannenbaum and his colleagues founded additional investment funds under the Fifth Street umbrella. FSC and FSFR are two publicly traded asset portfolio companies within the Fifth Street enterprise. Both FSC and FSFR invest in small and mid-

---

[1] The Registration Statement also refers to, collectively, the registration statement that was filed by the Company with the SEC on Form S-1 on or about September 8, 2014, all amendments thereto, and the Prospectus, which formed a part of the Registration Statement and became effective on or about October 29, 2014.

sized companies through the issuance of loans to these companies in connection with investments by private equity sponsors with the goal of generating investment income. This income is then paid out to shareholders through dividends.

3.     FSAM, and its predecessor entity, served as the manager and advisor for FSC, FSFR, and other Fifth Street funds. As of June 30, 2014, FSC provided about 90% of FSAM's assets under management ("AUM"), and thus FSAM's primary revenue source. FSFR, meanwhile, provided an additional 5% of FSAM's AUM. The amount of fees paid by these funds to FSAM is largely determined by these funds' portfolio assets and the returns on these assets.

4.     On October 28, 2014, FSAM filed the final amendment to the Registration Statement on Form S-1/A for the IPO, which was declared effective on October 29, 2014, and filed the IPO Prospectus on October 30, 2014 (collectively, the "Registration Statement"). In the Registration Statement, Defendants made materially false and misleading statements of fact and failed to disclose facts necessary to make the statements made therein not misleading, including, among other statements: (1) that FSC's investments in certain investments should have been put on non-accrual status prior to the IPO; (2) that, as a result, the value of these assets were overstated, as was FSC's "Pre-Investment Fee Net Investment Income"; (3) that FSC had overpaid FSAM fees; (4) that FSAM's AUM, revenue, net income and fees from FSC were all overstated; and (5) that, as a result, FSAM's announced dividend was not maintainable.

5.     Additionally, the Registration Statement failed to disclose that FSAM's conduct as the investment manager for FSC, as alleged herein, had impaired its ability to maintain its AUM growth and its ability to generate additional fee income, which put its investment advisory contract with FSC at risk. Moreover, the Registration Statement falsely portrayed the credit quality of FSC's

portfolio by failing to disclose that it had been negatively impacted by the degradation in credit quality of certain of its investments.

6.     In the IPO, Defendants[2] sold 6 million FSAM shares to the public at $17 per share, generating more than $100 million in gross proceeds for themselves.   In fact, Defendant Tannenbaum reaped more than $87.5 million in the IPO while Defendant Berman profited more than $5.8 million.  Additionally, even after the IPO, these individuals maintained control and most of the ownership over the Company.

7.     Just months after the IPO, on  February 9, 2015, FSC revealed that it had recorded a $62 million depreciation on its debt and that four of its investments had been placed on non-accrual status during the quarter.  These four investments totaled approximately $106 million at cost, or nearly 5% of FSC's entire debt portfolio. As a further indication of the rapid deterioration in the quality of FSC's portfolio, FSC disclosed that its total assets had increased to $2.9 billion at quarter end, which represented a more than 20% increase compared to the total assets at the end of the corresponding quarter the prior fiscal year, yet its net investment income had actually decreased by 3% compared to that quarter.

8.     FSAM shares declined $1.08 per share, or 8.01%, to close on February 9, 2015, at 12.40 per share, on unusually heavy volume.

9.     On May 15, 2015, FSAM announced its 2015 fiscal first quarter financial results in which it disclosed that the Company's net income had declined to $9.3 million from $11.8 million in the previous quarter, a more than 25% decline, even though the Company's AUM had increased during this same period.

---

[2] "Defendants" refers to Defendant   FSAM, Leonard M. Tannenbaum, Bernard D. Berman ("Berman"), Alexander C. Frank ("Frank"), Steven M. Noreika ("Noreika"), Wayne Cooper ("Cooper"), Mark J. Gordon ("Gordon"), Thomas L. Harrison ("Harrison"), and Frank C. Meyer ("Meyer").

10.     FSAM's shares declined $1.80 per share, or approximately 17%, to close on May 18, 2015 at $8.75 per share, on unusually heavy volume.

11.     On November 16, 2015, FSC's largest shareholder, RiverNorth Capital Management, LLC ("RiverNorth"), issued a public letter to FSC's Board of Directors requesting that FSC terminate its advisory agreement with FSAM.   Additionally, on November 16, 2015, FSAM announced that it had rescheduled its earnings report for the quarter ended September 30, 2015.

12.     FSAM's common stock declined $1.57 per share, or 25.40%, to close on November 17, 2015, at $4.61 per share, on unusually heavy volume.

13.     On November 23, 2015, FSAM disclosed that a wholly-owned subsidiary of FSAM had improperly recognized income at the time of the IPO from certain loan originations at the Fifth Street funds, and that as a result FSAM had been prematurely paid $3.3 million in fees.

14.     On December 7, 2015, FSAM announced that two members of the Board, Defendant Gordon and David J. Anderson, had resigned.  As a result of these resignations, all of the Company's purported independent directors on its Corporate Governance Committee had resigned in less than four months, leaving Defendant Tannenbaum as the committee's sole member.

15.     FSAM's common stock declined $0.31 per share, or 7.05%, to close on December 7, 2015, at $4.09 per share, on unusually heavy volume.

## II.     JURISDICTION AND VENUE

16.     The claims asserted herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §77k, §77l and §77o).

17.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, (15 U.S.C. §77v) and 28 U.S.C. §1331.

18.     Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act (15 U.S.C. §77v) and 28 U.S.C. §1391(b).  Substantial acts in furtherance of the alleged fraud or the

effects of the fraud have occurred in this Judicial District. One or more defendants maintain offices or conduct business within this Judicial District. Additionally, at times relevant hereto, FSAM's stock traded on the NASDAQ Stock Market.

19.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.   PARTIES

20.     Lead Plaintiffs Kieran Duffy and Susan Duffy purchased FSAM securities pursuant and/or traceable to the Company's Registration Statement and were damaged thereby, as is described in the Certification previously filed on March 7, 2016 and incorporated herein (Docket No. 17, Exhibit B).

21.     Defendant FSAM is a Delaware corporation with its principle executive office located at 777 West Putnam Avenue, 3rd Floor, Greenwich, Connecticut 06830. The Company's shares trade on the NASDAQ Stock Market under the symbol "FSAM."

22.     Defendant Leonard M. Tannenbaum ("Tannenbaum") was, at all relevant times, Chairman of the Board, Chief Executive Officer and a director of FSAM. Defendant Tannenbaum signed or authorized the signing of the false and misleading Registration Statement.

23.     Defendant Bernard D. Berman ("Berman") was, at all relevant times, Co-President, Chief Compliance Officer and a director of FSAM. Defendant Berman signed or authorized the signing of the false and misleading Registration Statement.

24.     Defendant Alexander C. Frank ("Frank") was, at all relevant times, Chief Operating Officer and Chief Financial Officer of FSAM. Defendant Frank signed or authorized the signing of the false and misleading Registration Statement.

25.     Defendant Steven N. Noreika ("Noreika") was, at all relevant times, Chief Accounting Officer of FSAM.  Defendant Noreika signed or authorized the signing of the false and misleading Registration Statement.

26.     Defendant Wayne Cooper ("Cooper") was, at all relevant times,  a director of FSAM. Defendant Cooper signed or authorized the signing of the false and misleading Registration Statement.

27.     Defendant Mark J. Gordon ("Gordon") was, at all relevant times, a director of FSAM. Defendant Gordon signed or authorized the signing of the false and misleading Registration Statement.

28.     Defendant Thomas L. Harrison ("Harrison") was, at all relevant times, a director of FSAM.  Defendant Harrison signed or authorized the signing of the false and misleading Registration Statement.

29.     Defendant Frank C. Meyer ("Meyer") was, at all relevant times, a director of FSAM. Defendant Meyer signed or authorized the signing of the false and misleading Registration Statement.

30.     Each of the persons listed in ¶¶22-29 are collectively referred to herein as the "Individual Defendants."  Each of the Individual Defendants either signed or authorized the signing of the defective Registration Statement and, as such, is liable under the Securities Act.

31.     Collectively, FSAM and the Individual Defendants are referred to herein as "Defendants."

## IV.     BACKGROUND

### A.     The Fifth Street Group of Companies

32.     Fifth Street was founded in 1998 by Defendant Tannenbaum as an asset management company specializing in investing in small- and mid-sized companies. Over the next decade,

Defendant Tannenbaum and his colleagues founded additional investment funds under the Fifth Street umbrella, including Fifth Street Mezzanine Partners II in 2005.

33.     In 2007, Defendant Tannenbaum launched a new fund that was converted into a business development company ("BDC") in 2008.  This fund, FSC, went public in June 2008. According to FSC, it is a specialty finance company that lends to and invests in small and mid-sized companies in connection with investments by private equity sponsors.  FSC claims that its investment objective is to maximize its portfolio's total return by generating current income from its debt investments and capital appreciation from its equity investments.

34.     In July 2013, another Fifth Street business development company went public.  This entity, FSFR, purports to be a specialty finance company that lends to small and mid-sized companies in connection with investments by private equity sponsors.

35.     Besides the two BDCs, Fifth Street also controls multiple private investment vehicles, including a hedge fund and structured credit funds.

36.     Prior to the formation of FSAM in 2014 and the IPO, Fifth Street Management LLC ("Fifth Street Management")[3] served as the manager and advisor for FSC, FSFR, and other Fifth Street funds.  In the IPO, Fifth Street Management became a wholly-owned subsidiary of Fifth Street Holdings, L.P., of which FSAM holds a 12% limited partnership interest.  The other 88% of Fifth Street Holdings, L.P. is owned predominately by Defendants Tannenbaum and Berman.  The post-IPO structure of the Fifth Street entities is depicted in the following chart:

---

[3] Prior to and after its IPO, FSAM and its principals operated through Fifth Street Management LLC, which is used synonymously with FSAM herein. Additionally, "Fifth Street Management Group" refers to Fifth Street Management LLC, FSC, Inc., FSC CT, Inc., FSC Midwest, Inc., Fifth Street Capital West, Inc. (and their wholly-owned subsidiaries) and certain combined funds.



**B.      Fifth Street Executives, Including Many of the Individual Defendants, Held Positions at Numerous of the Fifth Street Entities**

37.      Many of Fifth Street's officers and executives held multiple positions across the Fifth Street entities.  The fact that these individuals were in high-ranking positions at these entities, including FSAM (and its predecessor Fifth Street Management), FSC, and FSFR, confirms that they were knowledgeable of the financial condition and accounting practices of all of the entities at issue.

38.      For example, Defendant Tannenbaum served as the managing partner of Fifth Street Management from 2008 through 2014, and following the IPO, he served as CEO, Chairman of the Board and a director of FSAM.  Additionally, he served as CEO, Chairman of the Board and a director of FSC from 2007 through January 2015, and President from October 2007 through February 2010.  Defendant Tannenbaum also served as a director of FSFC from 2013 through 2016, Chairman of the Board from May 2013 through January 2014, Vice Chairman of the Board from January 2014 through September 2014, and CEO from May 2013 through September 2014.

39.     Likewise, Defendant Berman served as a partner of Fifth Street Management from 2008 through 2014, and a director of FSAM from 2014 through the present.  Additionally, he has served as Co-President of FSAM since 2014 and currently serves as its Chief Compliance Officer. Defendant Berman has served as a director of FSC since 2009, Chairman of the Board of FSC since September 2014, President of FSC from February 2010 through September 2014, Secretary of FSC from October 2007 through September 2014 and Chief Compliance Officer of FSC from April 2009 through May 2013. Defendant Berman also served as a director of FSFR since May 2013, Chairman of the Board of FSFR since January 2014 and its President from May 2013 through January 2014.

40.     Defendant Frank served as a partner of Fifth Street Management prior to the IPO and then Chief Operating Officer and Chief Financial Officer of FSAM after the IPO.   Defendant Frank also served as the Chief Financial Officer of FSC from September 2011 through July 2014 and the Chief Operating Officer of FSFR from November 2013 through July 2014.

41.     Defendant Norieka likewise served Chief Financial Officer of Fifth Street Management and FSAM from September 2008 through the present and he served as Chief Accounting Officer of FSAM and its predecessor from July 2014 through July 2015.  Additionally, Defendant Noreika served as the Controller of FSC from January 2013 through July 2014 and the Controller of FSFR from July 2013 through November 2013.  Moreover, Defendant Noreika also served as FSFR's Chief Financial Officer from November 2013 through July 2014 and since July 2015.

42.     Ivelin Dimitrov was a partner of Fifth Street Management from 2008 through 2014 and also served as Fifth Street Management's and then FSAM's Chief Investment Officer since June 2010.  Additionally, Mr. Dimitrov was the Chief Investment Officer of FSC since November 2010

and director of FSC since January 2010.  Moreover, he has served as a director of FSFR since September 2014 and its Chief Executive Officer since September 2014.

43.     Todd Owens has been the Co-President of FSAM since September 2014, and a director of FSC since November 2014.  Additionally, he served as the President of FSC in 2014 and has been a director of FSC since November 2014 and the Chief Executive Officer of FSC since January 2015.

### C.     Fifth Street's Business Development Companies

44.     As discussed above, FSC and FSFR are both business development companies. BDCs are regulated by the Investment Company Act of 1940 ("ICA") and the amendments to it in the Small Business Investment Incentive Act of 1980 ("1980 Amendments").   The 1980 Amendments were designed to remove obstacles in the ICA and the Investment Advisers Act of 1940 ("Adviser's Act") to incentivize publicly owned investment companies electing to be BDCs to invest in private, small businesses.   This involved lowering asset coverage requirements for borrowing, relaxing restrictions on affiliated transactions, and minimum requirements for investments in small business.  It also permitted investment advisers to charge incentive fees.

45.     A BDC is required to 1) have at least 70% of its investments in qualifying assets, and 2) make available significant managerial assistance to its portfolio companies.  One of the significant advantages of BDC's over traditional private equity is the liquidity afforded by being freely traded public securities.  BDCs are also allowed to issue derivative securities, subject to certain conditions. The 1980 Amendments reduced the 300% asset coverage requirement under the ICA to 200% for BDCs.  To qualify for the exemption, a closed-end company must elect to be treated as a BDC by filing notice with the SEC and is required to have a class of its equity securities registered under the 1934 Act and file reports as required by it.

46.     In connection with filing periodic reports, the BDC is required to value its portfolio assets on a quarterly basis.  If a trading market exists, then the assets must be valued at market value, otherwise the board of directors must determine the "fair value" of the assets in good faith.  In addition to filing periodic and other reports as required under the 1934 Act, management must report their trading in the BDC's stock and are prohibited from obtaining short swing profits from trading within a six month period.  Furthermore, transactions involving an investment company and related persons may require an SEC exemptive order or board approval.

47.     BDCs have the option to be taxed as a corporation or as a "regulated investment company" ("RIC").  To qualify as an RIC, the BDC must distribute 90% of its investment company taxable income to its shareholders, as well as meet requirements concerning the source of its income and the diversification of its portfolio.  The benefit of qualifying as an RIC is that BDC's avoid taxation on the portion of income and capital gains distributed to shareholders.

48.     Both FSC and FSFR have made the determination that they are to be treated as regulated investment companies or RICs.  Therefore, both entities must distribute 90% of their investment company taxable income to their shareholders.

1.     **FSAM's Advisory Contracts with the Fifth Street BDCs**

49.     Pursuant to Section 15 of the ICA, the relationship between an externally managed BDC and its investment adviser must be governed by a written agreement.  The agreement must describe all compensation and specify that it may be terminated at any time without penalty by the BDC's board of directors or by shareholder vote on not more than 60 days' written notice to the investment adviser, as well as provide for automatic termination in the event that it is assigned.  It must be approved by a majority of the BDC's board of directors, as well as by a majority of directors who are not parties to the contract or an "interested person" of a party at an in-person meeting of the board of directors called for the purpose of voting on the agreement.  The agreement may continue

for more than two years from the date of its execution, provided that it is approved annually by the BDC's board of directors or its shareholders.  Rule 38a-1 also requires the BDC to adopt and implement written policies and procedures designed to prevent violation of Federal Securities Laws that provide for the oversight of compliance by each investment adviser, principal underwriter, administrator, and transfer agent of the fund.

50.     FSAM has entered into such investment advisory agreements with FSC and FSFR. Pursuant to these investment advisory agreements, FSAM is entitled to management fees and performance fees for serving as the investment advisor to these entities.  According to the terms of these agreements, the management fees include both a base management fee and what is referred to as "Part I Fees." Additionally, FSAM is entitled to certain performance fees under the contracts that are referred to as "Part II fees."

### 2.     FSAM's Base Management Fees

51.     According to the Prospectus, gross assets are commonly referred to as "assets under management" or "AUM."[4] Gross assets include any borrowing for investment purposes and exclude cash and cash equivalents; therefore, base management fees are positively affected by increases in AUM even if a newly acquired asset is leveraged.

52.     In regards to FSAM's relationship with FSC, the base management fee equals an annual rate of 2% of the value of FSC's gross assets calculated at the end of its most recently completed fiscal quarter, adjusted for any equity capital raises or repurchases in said quarter.  These

---

[4] According to the Propectus, "'AUM' refers to assets under management of the Fifth Street Funds and material control investments of these funds, and represents the sum of the net asset value of such funds and investments, the drawn debt and unfunded debt and equity commitments at the fund or investment-level (including amounts subject to restrictions) and uncalled committed debt and equity capital (including commitments to funds that have yet to commence their investment periods)", and "'fee-earning AUM' refers to the AUM on which we directly or indirectly earn management fees, and represents the sum of the net asset value of the Fifth Street Funds and their material control investments, and the drawn debt and unfunded debt and equity commitments at the fund or investment-level (including amounts subject to restrictions)."

base management fees are paid to FSAM in cash, on a quarterly basis with partial months or quarters prorated accordingly, and are not subject to repayment or clawback.  FSAM is paid fees from FSFR in a similar manner except that FSAM's annual rate is equal to 1% of the value of FSFR's gross assets based on the average value of its gross assets of the last two completed quarters.

### 3.   FSAM's Part I Fees

53.   FSAM's management fees are comprised of both base management fees and "Part I" fees.  In regards to FSAM's investment advisory services with FSC, Part I Fees are paid on a quarterly basis and calculated based on FSC's "Pre-Incentive Fee Net Investment Income" for the immediately preceding fiscal quarter. The Pre-Incentive Fee Net Investment Income is the rate of return on the value of FSC's net assets at the end of the immediately preceding fiscal quarter.[5] If the Pre-Incentive Fee Net Investment Income does not exceed the hurdle rate of 2.0%, FSAM is not entitled to a Part I Fee. If any portion of FSC's Pre-Incentive Fee Net Investment Income exceeds the hurdle rate but is less than or equal to 2.5% in any fiscal quarter (10% annualized), then FSAM is entitled to 100% of the portion between 2.0% and 2.5%, which is referred to as the "catch-up." The "catch-up" provision is intended to provide FSAM with an incentive fee of 20% on all Pre-Incentive Fee Net Investment Income, as if a hurdle rate did not apply when the Pre-Incentive Fee Net Investment Income exceeds 2.5% in any quarter.  Moreover, FSAM is entitled to 20% of the amount of FSC's Pre-Incentive Fee Net Investment Income, if any, that exceeds 2.5% in any fiscal quarter (10% annualized) once the hurdle is reached and the catch-up is achieved.[6]

54.   In regards to its contractual relationship with FSFR, FSAM's Part I Fees are calculated in a similar manner to FSC's, except with slightly revised figures.  If FSFR's Pre-

---

[5] For example, if at the end of Q1, FSC's net assets equals $1,000, and in Q2, FSC's investment return equals $33; then the Q2 Pre-Incentive Fee Net Investment Income would equal 3.3%.

[6] For example, if the Pre-Incentive Fee Net Investment Income equals 2.4%, then FSAM is entitled to Part I fees of 0.4%.  And if Pre-Incentive Fee Net Investment Income equals 3.0%, then FSAM is entitled to Part I fees of 0.6%.

Incentive Fee Net Investment Income does not exceed the hurdle rate of 1.5%, then FSAM is not entitled to a Part I Fee. If any portion of FSFR's Pre-Incentive Fee Net Investment Income exceeds the hurdle rate but is less than or equal to 2.5% in any fiscal quarter (10% annualized), then FSAM is entitled to 50% of that portion, which is referred to as the "catch-up." The "catch-up" provision is intended to provide FSAM with an incentive fee of 20% on the Pre-Incentive Fee Net Investment Income as if the hurdle rate did not apply when it exceeds 2.5% in any quarter. Similar to its agreement with FSC, FSAM is entitled to 20% of the amount of FSFR's Pre-Incentive Fee Net Investment Income, if any, that exceeds 2.5% in any fiscal quarter (10% annualized) once the hurdle is reached and the catch-up is achieved.

55.     According to the Company, FSAM includes Part I fees in management fees because they are consistent, highly predictable, paid quarterly in cash and are not subject to repayment or clawback. No fees are recognized until the BDCs net investment income exceeds the respective hurdle rate, with the "catch-up" provision.

### 4.     FSAM's Part II Fees

56.     Part II fees are structured in the same manner for both FSC and FSFR. FSAM often refers to the Part II fees as the Performance Fees because they are subject to reversal and are less predictable than the Part I fees, which are included in management fees. Part II Fees equal 20% of realized capital gains, computed net of all realized capital losses and unrealized capital depreciation on a cumulative basis, less the aggregate amount of any previously paid capital gain incentive fees. These fees are payable in arrears as of the end of each fiscal year and may be subject to reversal if recorded performance fees exceed the amount due to the general partner or investment manager based on cumulative investment returns. According to the Prospectus, FSAM had not earned any performance fees (Part II) up to that date from either FSC or FSFR.

**D.     Fifth Street's Campaign to Increase the AUM of FSAM Prior to the IPO**

57.     In the time leading up to the IPO, FSAM's management fees from the two BDC's, FSC and FSFR made up the significant majority of its total revenue with these fees comprising 93% of the total revenue generated for the year ended December 31, 2013, and 96% of total revenue for the six months ended June 30, 2014 (including 42% and 38% attributable to Part I Fees). As of June 30, 2014, FSC and FSFR provided approximately 95% of FSAM's assets under management , 90% and 5% respectively, which had increased in total since December 31, 2010 by a compound annual growth rate ("CAGR") of 52.7%.

58.     In order to increase the amount of FSAM's AUM and related fees so that the Company would look more prosperous for its IPO, FSC and FSFR instituted a series of offerings to raise additional funds.  With these funds, the BDCs increased their investments, which in turn increased FSAM's AUM, making its upcoming IPO more promising and potentially more profitable for FSAM's primary owners, Defendants Tannenbaum and Berman.

59.     On September 26, 2013, FSC conducted a follow-on offering of 17,643,000 shares at a price of $10.31 per share.  This offering resulted in gross proceeds for FSC of $181.9 million.

60.     On July 11, 2014, FSC conducted a follow-on public offering of 13,250,000 shares at $9.95 per share.  This offering resulted in gross proceeds for FSC of $131.8 million.

61.     In September 2014, FSC conducted an at-the-market offering of 841,456 shares at $9.86 per share.  This offering resulted in gross proceeds for FSC of $8.3 million.

62.     As a result of these offerings, FSC was able to greatly increase its investment portfolio during 2014.  In fact, according to FSC, it increased its total assets to $2.7 billion by June 30, 2014, as compared to $2.1 billion at September 30, 2013, an increase of more than 28 percent during this time period.

63.     On August 19, 2014, FSFR completed a follow-on public offering of 22,800,000 shares at $12.91 per share.  This offering resulted in gross proceeds for FSFR of $276.2 million. This offering price was below FSFR's then-current share price of $13.31 per share on August 13, 2014 and then current net asset value per share, making the offering dilutive of its shareholders.

64.     As a result of this offerings, FSFR was able to greatly increase its investment portfolio during 2014.  In fact, according to FSFR, it increased its total assets to $412.5 million at September 2014, as compared to $101.5 million at September 30, 2013, an increase of more than 306% percent during this time period.

## V.     FSAM'S AUM AND FEES WERE OVERSTATED BY FSC'S FAILURE TO TIMELY STOP THE IMPROPER ACCRUAL OF INTEREST ON CERTAIN OF ITS INVESTMENTS AND FSC'S INFLATION OF THE VALUE OF ITS ASSETS

65.     In part due to these increases in the amount of assets under management, according to the Prospectus, FSAM's management fees increased 49.4% or $14.9 million from June 30, 2013 to June 30, 2014, including an $11.5 million or 72.7% increase in base management fees and $3.4 million or 23.7% increase in Part I fees.  The increase was driven by a $1.1 billion or 38.9% increase in AUM during this time period.

66.     This increase in FSAM's AUM, however, was the result of FSC taking on additional debt in contravention of its claims that they were operating a conservative investment portfolio that was specifically designed to mitigate losses.  In reality, FSAM's AUM was overstated; FSC net investment income was inflated by failing to timely stop the accrual of investment interest.  FSC had misstated its interest income, payment-in-kind interest income, fee income, total investment income, and expenses such as the base management fee, net investment income, and earnings per share, which were financial metrics that FSAM's future success and prospects relied on.  Additionally, FSC overstated its investment assets by failing to write them down to their fair market value.

A.      **Accounting Guidelines for the Accrual of Interest and the Fair Market Value of Investments**

67.      According to FSC, it ceased accruing interest, including payment-in-kind ("PIK") interest,[7] for transactions where there was insufficient value to support the accrual or if FSC did not expect the portfolio-company to be able to pay all principal and interest due.  While FSC's portfolio-companies were unable to pay all principle and interest due, requiring  FSC to prop up these companies through loans that were immediately written off, FSC failed to properly account for these entities on a non-accrual basis.  This failure to put these assets on non-accrual status was negligent in light of the fact that GAAP recognizes that losses associated with adjustments or write-offs of accrued interest can significantly affect an investment company's income statement.  ASC 946-320-05-8 ("Writeoffs of interest receivable differ from traditional writeoffs of trade accounts receivable since they can significantly affect an investment company's statement of operations, the performance measurement ratios of expenses to average net assets, and net investment income to average net assets.").

68.      Prior to the FSAM IPO, FSC's PIK interest dramatically increased in tandem with the troubles with its underlying investment.  In fact, FSC's PIK interest increased from $23.9 million in its 2013 fiscal year to $39.7 million in its 2014 fiscal year while FSC only received $8.5 million in PIK interest during fiscal 2013 and $8.0 million in PIK interest during fiscal 2014 these periods.  This alerted Fifth Street to the issues at the underlying investments.

69.      Additionally, FSC failed to write-down the value of its assets in contravention of GAAP.  Pursuant to ASC Topic 820, *Fair Value Measurements and Disclosures* ("ASC 820") and ASC Topic 946, *Financial Services – Investment Companies* ("ASC 946"), FSC was required to "measure investments in debt and equity securities subsequently at fair value."  ASC 946-320-35-1.

---

[7] According to FSC, PIK interest is defined "as interest income on an accrual basis to the extent such amounts are expected to be collected."

Under these accounting guidelines, fair value is the "price that would be received to sell an asset or paid to transfer a liability in an orderly transaction in the principal (or most advantageous) market at the measurement date under current market conditions (that is, an exit price) regardless of whether that price is directly observable or estimated using another valuation technique." ASC 820-10-35-9A.

70.     The accounting guidelines further clarify that "the objective of a fair value measurement … [is] to estimate the price at which an orderly transaction to sell the asset or to transfer the liability would take place between market participants at the measurement date under current market conditions (that is, an exit price at the measurement date from the perspective of a market participant that holds the asset or owes the liability)." ASC 820-10-05-1B.  FSC, however, accounted for the value of its assets in ways that allowed it to recognize income before this income was actually paid to the FSC even where it was unlikely that such income would ever be paid to FSC, such as through the use of PIK interest.[8]   Instead of properly accounting for its troubled assets, FSC failed to take appropriate write-downs of these assets in violation of GAAP even though it worked closely with the companies at issue and was aware of the problems with the financial condition of these entities that required cash infusions for their short-term survival.

71.     Unsurprisingly, just a couple of months after the IPO, FSC belatedly wrote-down the value of four of its assets: TransTrade Operators, Inc. ("TransTrade"),  JTC Education, Inc. ("JTC"), Phoenix Brands Merger Sub LLC ("Phoenix") and CCCG, LLC ("CCCG"). The overstatement of investment income from these investments had a material impact on FSC's financial statements for

---

[8]  Defendants should have been even more cautious in their assumptions regarding potential repayment and valuation of these assets since, as GAAP acknowledges, "[i]ssues of high-yield debt securities are more likely to default on interest or principal than are issues of investment-grade securities." ASC 946-320-05-3.

the third and fourth fiscal quarters of 2014, which in turn severely impacted FSAM's revenue stream and past performance, and increased the risk that FSAM would be replaced as FSC's investment advisor.

> **B.**   **FSC Overstated Income from and Misrepresented the Fair Value of Its Loan to TransTrade by Failing to Put It on Non-Accrual Prior to the IPO**

72.    TransTrade is a privately held Delaware corporation, with its corporate headquarters located by the Dallas/Fort Worth Airport.[9]  The company is a full-service provider of transportation and logistics services in the United States and internationally.  In addition to its corporate headquarters, TransTrade maintains offices in Colorado, Washington, and Florida.

73.    Prior to FSAM's IPO, there were numerous signs that TransTrade would have difficulty repaying its debt and the related interest to FSC.[10]  In September 2009, TransTrade was sold to Milestone Partners ("Milestone"), a private equity group.  FSC invested approximately $11 million in the First Lien Term Loan, as well as, a Revolver of approximately $39,000 as part of the transaction.  *See* FSC Form 10-Q, filed December 9, 2009, at 72.  In October 2012, TransTrade's former President and co-owner, following the expiration of his non-compete agreement, resigned from TransTrade and opened a competing logistics company called Axiom Worldwide Logistix, Inc. ("Axiom").  Many of TransTrade's key employees with close customer relationships left TransTrade to join Axiom, leaving the company with executives who lacked experience and a depleted salesforce.

74.    In December 2012, FSC restructured the interest terms on TransTrade's loans, cutting the cash interest rate by 6% on the Term A loan for an increase of 6% in the PIK interest rate.  The

---

[9] Prior to May 2013, TransTrade Operators, Inc. was named Trans-Trade Brokers, Inc.  Herein, both companies are referred to as "TransTrade" unless otherwise indicated.

[10] FSC would be particularly aware of these facts since TransTrade was one of FSC "Control Investments," which meant that FSC owned more than 25% of the voting shares of the company or controlled more than 50% of the board.

Term B loan, which was on non-accrual status as of December 31, 2012, was written down from $6.2 million to zero, and the 12% cash interest was exchanged for 12% PIK. *See* FSC Form 10-Q, filed February 6, 2013, at 13. This allowed TransTrade to stop making significant current interest payments in exchange for a promise to pay that interest at the end of the loan term.

75.     In April 2013, one of TransTrade's largest customers, Shaw Industries Group, took its business to Axiom. Shaw accounted for approximately $40 million of TransTrade's $80 million annual revenue. In May 2013, after losing customers to Axiom, TransTrade sued Axiom and TransTrade's former employees who went to work for Axiom for stealing its trade secrets and violating their non-compete agreements. Having lost its key sales people and many of their customers, TransTrade was unable to pay its credit obligations.

76.     In May 2013, Trans-Trade Brokers, Inc. was restructured to a new entity, TransTrade Operators, Inc. As part of the restructuring, FSC foreclosed on its investment and restructured for debt and equity securities in the restructured entity. FSC recorded a realized loss of $6.1 million on the transaction. FSC Form 10-Q, filed August 7, 2013, at 47. The principal of the new First Term Lien Loan to TransTrade was approximately $13.6 million, which was valued at $13.5 million. Additionally, the due date was extended from September 10, 2014 to May 31, 2016. FSC also invested approximately $3 million in Preferred Units of the company, which were valued at $2.6 million.

77.     In November 2013, FSC reported its financial results for the following quarter that indicated that it had cut the value of TransTrade's Preferred Units by approximately $2 million to $539,000. FSC Form 10-K, filed November 25, 2013, at 83.

78.     In February 2014, FSC authorized yet another swap of cash interest for PIK interest in FSC's fiscal quarter that ended on December 31, 2013. In this transaction, TransTrade was allowed

to reduce it 11% cash interest rate to 0% in exchange for adding 11% to their PIK rate, which now totaled 14%. FSC Form 10-Q, filed February 6, 2014, at 14. This allowed TransTrade to defer payments to FSC. Additionally, FSC made an additional investment of approximately $1 million in TransTrade preferred units during the quarter, which FSC wrote down by approximately half during the quarter.

79.    In May 2014, FSC reported that it now valued TransTrade's first lien term loan at only 79% of cost. Additionally, FSC made another investment of approximately $1 million in preferred units during the quarter, yet immediately wrote down the value of this investment to zero. FSC Form 10-Q, filed May 8, 2014, at 5.

80.    In August 2014, FSC reported that it had infused additional capital into TransTrade. Specifically, FSC purchased $1.4 million worth of Series A Preferred Units, which had their value immediately written down to zero during the quarter. FSC Form 10-Q, filed August 7, 2014, at 5.

81.    Additionally, in August 2014, FSC unilaterally decided to lower TransTrade's PIK interest rate from 14%-10% without receiving any other benefits, such as an increased cash interest rate, in the transaction. This demonstrates that Fifth Street negligently disregarded that without such extraordinary measures that TransTrade would not be able to repay its debts to FSC.

82.    Since TransTrade's restructuring in 2013, FSC reported that the cost of TransTrade's First Term Lien Loan had increased by 3% each quarter. This demonstrates that FSC had not been paid cash interest on this loan but was instead accruing the 3% PIK interest each quarter. In spite of this fact and that FSC was immediately writing down the value of its investments in TransTrade during this and the previous quarters, FSC failed to put TransTrade on non-accrual status and continued to recognize interest income on this investment. This was negligent in light of the fact

that TransTrade had demonstrated it was unable to pay FSC's loans without consistent infusions of capital from FSC.

83. Just months after FSAM's IPO, FSC finally put its investments in TransTrade, along with other investments discussed below, on non-accrual status. Essentially, FSC finally acknowledged that it could no longer justify recognizing non-cash interest income from TransTrade. At the same time it announced that TransTrade would be put on non-accrual status, FSC also took a $2.2 million write-down of the fair value of its investment in TransTrade.

84. As the following chart illustrates,[11] there was almost no difference in FSC's loss from First Lien Term A loan to TransTrade prior to and after October 2014 IPO:

| Quarter Ended | Principal | Cost | Fair Value | Unrealized Gain/(Loss) | Fee Income |
|---|---|---|---|---|---|
| June 30, 2013 (restructuring) | 13,556 | 13,556 | 13,507 | (49) | 164 |
| Sept 30, 2013 | 13,660 | 13,660 | 13,524 | (133) | 164 |
| Dec 31, 2013 | 14,154 | 14,154 | 14,021 | (3,162) | 512 |
| March 31, 2014 | 14,656 | 14,656 | 11,494 | (3,857) | 511 |
| June 30, 2014 | 15,180 | 15,180 | 11,323 | (4,463) | 537 |
| Sept 30, 2014 | 15,572 | 15,572 | 11,109 | (6,707) | 442 |
| Dec 31, 2014 (PIK non-accrual) | 15,973 | 15,572 | 8,865 | (7,108) | 28 |

In fact, the approximately $400,000 increase in losses on this loan during the quarter in which it was placed on non-accrual status was the least amount of loss suffered by the loan in the last five quarters.

85. Similarly, as demonstrated in the following chart, FSC's losses on its equity investments to TransTrade had been written-off immediately every quarter since TransTrade's 2013 restructuring:

---

[11] All figures in charts are in thousands of dollars unless otherwise indicated.

| Quarter Ended | Series A Cost | Series A Fair Value | Series B/Preferred Cost | Series B Fair Value | Total Unrealized Gain/(Loss) |
|---|---|---|---|---|---|
| June 30, 2013 (restructuring) | | | 3,033 | 2,608 | (425) |
| Sept 30, 2013 | | | 3,033 | 539 | (2,494) |
| Dec 31, 2013 | | | 4,117 | 685 | (3,432) |
| March 31, 2014 | | | 5,200 | 0 | (6,605) |
| June 30, 2014 | 1,404 | 0 | 5,200 | 0 | (5,200) |
| Sept 30, 2014 | 2,000 | 0 | 5,200 | 0 | (7,200) |
| Dec 31, 2014 (PIK non-accrual) | 4,000 | 0 | 5,200 | 0 | (9,200) |

Moreover, the sheer scale of the capital injections that FSC used to prop up its First Lien Term A loan demonstrates that Defendants negligently disregarded that the loan was without any real value. Loans of approximately $15 million should not require more than $9 million to remain solvent. Therefore, FSC negligently failed to write down its First Lien Term A loan well prior to the IPO when FSC first started propping up its investment in TransTrade by injecting millions of dollars into the company and should have likewise immediately stopped recognizing interest income on this loan.

### C. FSC Overstated Income from and Misrepresented the Fair Value of Its Loan to CCCG by Failing to Put It on Non-Accrual Prior to the IPO

86.     CCCG, LLC is the parent company of Express Tech Tulsa, Express Group Holdings, LLC, Express Integrated Technologies, LLC, EIT Canada LTD., St. George Steel, and Express Metal Fabricators, LLC.   These oilfield services companies engineer, design and fabricate heat transfer and environmental compliance technologies, principally for the energy exploration, power generation, refining, chemical and mining industries.

87.     CCCG's original loan from FSC was due July 29, 2015 and had a cash interest of LIBOR +8% and 1% PIK interest.  Effective November 15, 2012, FSC adjusted the interests rates on

their loans to CCCG, adding 0.5% cash interest and 1.0% PIK interest on the Term Loan.  FSC Form 10-Q, filed February 6, 2013, at 13.

88.     As the following chart demonstrates, from that date on, FSC's gain on this loan decreased every quarter, turning into a loss back in 2013.  Yet, even though the CCCG's loan was consistently losing value and the loss from the loan ballooned more than 400% with FSC recording a $3 million unrealized in the quarter prior to the IPO, FSC failed to put the loan into non-accrual status and continued to allow the accrual of FSC's CCCG's interest.

| Quarter Ended | Principal | Cost | Fair Value | Unrealized Gain/ |
|---|---|---|---|---|
| Dec 31, 2012 | 34,794 | 34,348 | 35,174 | 826 |
| March 31, 2013 | 34,748 | 34,348 | 35,174 | 826 |
| June 30, 2013 | 35,057 | 34,580 | 35,337 | 757 |
| Sept 30, 2013 | 35,148 | 34,717 | 34,988 | 271 |
| Dec 31, 2013 | 35,328 | 34,926 | 34,727 | (199) |
| March 31, 2014 | 34,223 | 33,850 | 33,510 | (340) |
| June 30, 2014 | 34,396 | 34,053 | 33,177 | (876) |
| Sept 30, 2014 | 34,572 | 34,259 | 30,309 | (3,950) |
| Dec 31, 2014 (PIK non-accrual) | 34,748 | 34,290 | 18,125 | (16,165) |

89.     Following the IPO, FSC placed the PIK component of the loan on non-accrual (the cash component of the loan would be place on non-accrual the next quarter) and recorded a $12.2 million unrealized loss on the investment in that quarter. By that time, FSC belatedly acknowledged its CCCG investment had lost approximately 50% of its value.

**D.      FSC Overstated Income from and Misrepresented the Fair Value of Its Loan to Phoenix by Failing to Put It on Non-Accrual Prior to the IPO**

90.     Phoenix was founded in 2003 and has its headquarters in Stamford, CT.[12]  It offers a range of fabric colors and laundry additives, detergents, arctic powders, starch and non-starch ironing aids, stain removers, fabric softeners, wrinkle releasers, and fabric fragrances for household cloth cleaning needs.  Its household product brands include Fab, Ajax and Rit dye.  The introduction of "mono-dose" laundry products by Tide during the first quarter of 2012 with heavy promotional support from Proctor & Gamble had greatly hurt the company's sales.  Costs for the company had also begun to increase around this time due to supply agreements which had penalties and fees for failing to meeting minimum purchase requirements.

91.     By September 30, 2012, FSC had invested approximately $30 million in Phoenix through a senior term loan, a subordinated term loan, and a first lien revolver, with FSC reporting that the fair value of these loans were $29.3 million.  FSC Form 10-K, filed November 25, 2013, at 85.  Of these loans, the subordinated term loan was by far the largest.  The original terms for the subordinated term loan was a 10% cash interest and a 3.875% PIK interest.  In November 2013, FSC raised the cash interest rate 2% to 12.75%.[13]

92.     In August 2014, FSC materially altered the terms of the subordinated term loan, decreasing the cash interest rate from 12.75% to 0% and increasing the PIK interest rate from 12.75% to 16.625%.  Essentially, FSC allowed Phoenix to simply swap its cash interest for PIK interest that was not required to be paid for years, if at all.  This modification eliminated Phoenix's need to provided FSC with actual cash payment on this loan, while FSC reported additional PIK income in its financial statements. The most logical reason for allowing Phoenix to simply stop paying cash on its loan without requiring any additional concessions from Phoenix was that it was

---

[12] Information in this section was based on Phoenix's bankruptcy filings.

[13] The cash interest rate on this loan had already been increased 0.75% in March of 2013.

experiencing hardship meeting its obligations and that FSAM negligently delayed the writing down of this loan until after the IPO.

93.     Just months later, however, FSC disclosed that it had placed Phoenix's subordinated term loan on non-accrual status and was recording a $10.3 million write-down on this loan.

**E.     FSC Overstated Income from and Misrepresented the Fair Value of Its Loan to JTC by Failing to Put It on Non-Accrual Prior to the IPO**

94.     JTC was incorporated in 2008 in Indianapolis, Indiana as a for-profit provider of post-secondary education and training services in the healthcare and wellness industries.  It also provides business and computer training programs, as well as an English as a second language program.  JTC offers financial assistance and scholarships and has career placement services to assist their students.

95.     FSC had issued JTC a $14.5 million subordinated term loan that was due on November 1, 2017 that had a cash interest rate of 13%.  During the FSC's 2014 fiscal year, FSC reported that this loan's fair value and principle remained consistent.

96.     However, after FSAM's IPO, FSC disclosed that  it had revised the JTC loan so that its cash interest rate became 0% and that its PIK interest rate was now 13.25%.  Additionally, only after the IPO did FSC disclose that the principal on the loan had increased by $1.3 million which indicated that JTC had not paid FSC its cash interest on its loan during 2014.  In essence, JTC had failed to pay FSC pursuant to its loan for eight months, yet FSAM negligently failed to disclose this fact and that this loan should have been placed on non-accrual in the Registration Statement.

**F.     FSAM's Net Income Was Overstated Due to Improper Recognition of Interest Income**

97.     As discussed above, FSC improperly recognized interest income for the four portfolio investments that were ultimately put on non-accrual. The chart below reflects the amount of improperly recognized interest income in the quarter ended June 30, 2014, which was the last period of financial results that were provided in FSAM's Registration Statement:

|  | TransTrade | Phoenix Sr. Term Loan | Phoenix Subordinated Term Loan | JTC | CCCG | Total |
|---|---|---|---|---|---|---|
| Cash Interest (FSC's 6/30/14 10-Q) | 0% | 5.75% | 0% | 13.25% | 8.5% | |
| PIK Interest (FSC's 6/30/14 10-Q) | 14% | | 16.625% | 0% | 2% | |
| Principal (FSC's 6/30/14 10-Q) | $14,656 | $5,197 | $22,030 | $14,500 | $34,223 | $90,606 |
| PIK Interest Overstated | $513 | | $916 | | $171 | $1,600 |
| Total Interest Overstated | $513 | $75 | $916 | $479 | $898 | $2,881 |

98.    As a result of incorrectly recognizing interest income, FSC's "Pre-Investment Fee Net Investment Income" was inflated, which was used to calculate the fees which FSAM earned.  For example, FSAM would have received approximately $320,000 less in fees for the quarter ended June 30, 2014 if FSC had put those four portfolio investments on PIK non-accrual in a timely manner. While FSAM reported $1,726,514 pro forma net income or $0.29/share for the six months ended June 30, 2014 in the Prospectus, as the below chart demonstrates, that amount should have been $1,406,514 or $0.23/share after the removal of the improperly recognized fees earned due to the improper recognition of PIK interest income.

| Total Improperly Recognized NII from Non-Accruals | 2,881 |
|---|---|
| Improperly Recognized NII from Non-Accruals from PIK interest | 1,600 |
| Overstatement of FSAM fees = 20% of Improperly Recognized NII | 576 |
| Overstatement of FSAM fees from PIK interest only = 20% of Improperly Recognized NII | 320 |
| FSAM Pro-forma Net Income Attributable to controlling interests (Prospectus F-29) | 1,726.5 or $0.29/share |
| FSAM Pro-forma Net Income Attributable to controlling interests - Adjusted for Improper Recognition (PIK only) | 1,150.5 or $0.19/share (1,406.5 or $0.23/share) |

## VI.   DEFENDANTS HAVE ADMITTED THAT FSAM'S FEES WERE OVERSTATED AT THE TIME OF THE IPO

99.     On November 23, 2015, FSAM issued a press release entitled, "Fifth Street Asset Management Inc. Announces Third Quarter 2015 Results."  Therein, the Company disclosed that a wholly-owned subsidiary of FSAM had improperly recognized income from certain loan originations to the at the Fifth Street funds and that, as a result, FSAM had been prematurely paid $3.3 million in fees.  As the press release, in relevant part, explained:

> Subsequent to the end of the September quarter, we identified adjustments in the calculation of Part I management fees previously paid to FSAM by Fifth Street Finance Corp. ("FSC") and Fifth Street Senior Floating Rate Corp. ("FSFR") (collectively, "the BDCs"). The identified adjustments related to incorrect information used by the BDCs' Administrator, a wholly-owned subsidiary of FSAM. It was determined that in the case of certain transactions entered into by FSC and FSFR, origination fees that were received at the close of the transaction should be recognized as income over time rather than in the period the transaction closed. As a result of that determination, the BDCs cumulatively paid $3.3 million of Part I management fees prematurely.

100.     Additionally, on December 1, 2015, FSC filed its annual report for its fiscal year that ended on September 30, 2015.  Therein, FSC disclosed that it had identified material weaknesses in its internal controls over financial reporting "related to not having the appropriate design or not properly maintaining effective controls to internally communicate current accounting policies and procedures including the nature of supporting documentation required necessary to validate certain portfolio company data."  FSC further disclosed that these accounting errors had overstated its payments to FSAM at the time of FSAM's IPO:

> During the three months ended September 30, 2015, the Company identified errors in the recognition of fee income from fiscal years ended 2012 through 2015, as well as the consolidation of First Star holding companies in 2015.  The errors primarily related to recognizing fee income at deal close when the amounts did not represent a separately identifiable revenue stream and instead were more related to underwriting the investment. ***These errors mainly affected the timing of when income should be recognized and were partially offset by the overpayment of Part I Fees paid to***

*FSM.* The Company assessed the materiality of the errors on its prior quarterly and annual financial statements, assessing materiality both quantitatively and qualitatively, in accordance with the SEC's Staff Accounting Bulletin ("SAB") No. 99 and SAB No. 108 and concluded that the errors were not material to any of its previously issued financial statements. ***The cumulative adjustment as of September 30, 2014 was a reduction of $8.5 million of fee income partially offset by a $3.6 million increase to interest income and a $1.0 million decrease to the incentive fee payable to FSM***, resulting in a $3.9 million reduction to net investment income.

(Emphasis added.)

101.    On that same day, December 1, 2015, FSC held an earning conference call with analysts and investors to discuss its financial results.  On this call, Defendant Noreika, in response to a question from an analyst, disclosed that these accounting issues went back to 2012, well before the FSAM IPO:

[Analyst]: Hi, guys. ***Just going back to the accounting clarification restatement, I mean GAAP is pretty clear. Origination fees or amortized construction fees are taken upfront*** and as Ivelin said you guys pride yourselves on the origination platform and essentially controlling the loan documentation. So can you give us a bit more color on where did the problem come up because, obviously, this goes back several years and has gotten past the orders as before?

So the question is was there a problem – where were these self-originated loans, was there a problem in passing information between the loan documentation team and the accounting team as to the wording, whether it was the origination versus structuring? And I guess to that point, if they were self-originated, has a third-party law firm familiar with loan documentation taken a look at these deals and other deals to see if any of the loan doc wording is ambiguous?

[Defendant Noreika]: Robert, it's Steve. I think a lot of the questions and points that you raised are accurate. ***This goes back to 2012***, and it centers around a certain type of loan like probably syndicated loan that we might do where the fees should be amortized as income over time, as you said. And it related basically to, we did not have sufficient documentation to support the type of fees that we were taking. So we are working to improve that going forward with PwC. They've been very helpful. And you'll continue to see results to that end.

(Emphasis added.)

102.    These accounting errors caused the Registration Statement to be materially false and misleading due to (1) the overpayment of fees by FSC to FSAM and (2) the overstatement of

FSAM's GAAP revenues from management fees.  Additionally, because FSAM is responsible for FSC's revenue recognition practices as its investment advisor, FSC's admission that it had material weaknesses in its financial reporting prior to the IPO materially impacted FSAM.

## VII.   THE REGISTRATION STATEMENT AND IPO

103.     On September 9, 2014, the Company filed the Registration Statement with the SEC on Form S-1 for an offering up to $200 million in Class A common stock.  On September 22, 2014, the Company filed Amended No. 2 to Form S-1 Registration Statement with the SEC on Form S-1/A, and on September 25, 2014, the Company filed Amended No. 2 to Form S-1 Registration Statement with the SEC on Form S-1/A, both with proposed maximum offering amounts of $200 million.

104.     On October 9, 2014, the Company filed Amended No. 3 to Form S-1 Registration Statement with the SEC on Form S-1/A for the sale of 9,200,00 shares of Class A common stock at a proposed maximum offering price of $26.00 per share and a proposed maximum offering amount of $239.2 million.  However, FSAM subsequently decided to delay its offering after not receiving the reception from the market that it expected.  As *MarketWatch*'s article entitled, "Fifth Street Asset Management pulls IPO," that was published on October 22, 2014, in relevant part, explained:

> Fifth Street Asset Management said Wednesday it is postponing its initial public offering, citing continued volatility and difficult conditions in the equity markets.
>
> The credit-focused asset manager with nearly $6 billion under management did not offer any possible timing for another attempt at a listing.
>
> "While we received demand from potential investors, market conditions are not optimal for an IPO at this time," Chief Executive Leonard M. Tannenbaum said in a statement.
>
> The recent wild swings in the market, fueled by global growth concerns, tensions in Ukraine and the Middle East and Ebola fears, has many companies thinking twice about going public.

105.     Similarly, *Bloomberg* published an article written by Leslie Picker entitled, "Fifth Street Tries Again With Scaled Back IPO," that explained:

> Fifth Street Asset Management Inc., which pulled its initial public offering a week ago as stock markets tumbled, filed for the sale again with a target that's half what it originally sought.
>
> The company, which was initially scheduled to price its IPO on Oct. 21, said the next day that it was scrapping the deal and that it would withdraw its registration statement.
>
> Signaling a recovery in demand, the asset manager amended its original filing yesterday to seek $102 million, offering 6 million shares at $17 apiece.
>
> The Standard & Poor's 500 Index has rebounded in the week since Fifth Street tried to raise as much as $208 million, gaining 2.3 percent through yesterday. Volatility in the stock market, another key barometer for an IPO's advisers, has also fallen sharply.
>
> Leonard M. Tannenbaum, the founder and chief executive officer of Fifth Street, was set to become one of the world's youngest billionaires at the original price range. With yesterday's haircut, his stake is worth about $683.5 million, according to the company's prospectus.

(Emphasis added.)

106.     On October 28, 2014, the Company filed Amended No. 4 to Form S-1 Registration Statement with the SEC on Form S-1/A, which was declared effective on October 29, 2014, the same day that the IPO was priced at $17.00 per share.   Together with the Prospectus filed with the SEC on Form 424B4 on October 30, 2014, the Registration Statement[14] offered for sale 6 million shares of FSAM Class A common stock to the public at a price of $17 per share.  Shares began trading on October 30, 2014, on the NASDAQ Global Select Market under the symbol "FSAM."

---

[14] The Registration Statement also refers to, collectively, the registration statement that was filed by the Company with the SEC on Form S-1 on or about September 8, 2014, all amendments thereto, and the Prospectus, which formed a part of the Registration Statement that became effective on or about October 29, 2014.

107.    On November 4, 2014, the Company announced that FSAM had closed its IPO of 6,000,000 shares of Class A common stock at $17.00 per share.

108.    Pursuant to the Registration Statement,  the net proceeds from the offering were used to purchase limited partnership interests of Fifth Street Holdings L.P. from its limited partners, which included Defendants Tannenbaum and Berman.  None of the proceeds were to be retained by FSAM, but instead were to be used by FSAM to purchase ownership interests from the principals of FSAM.  According to the Prospectus, in the IPO, the principals of FSAM would be issued more than 42.8 million shares of Class B common [15] and an equal amount of "Holdings LP interests" that were held primarily by Defendants Tannenbaum and Berman following the IPO.  Additionally, the owners of the Class B common stock had the right in two years to convert the Class B shares into Class A shares on a one-to-one basis.

109.    In essence, the IPO enabled Defendant Tannenbaum and his colleagues to cash out a large percentage of their ownership interests in Fifth Street Management without giving up control of the Company.  They were very successful in achieving this outcome with Defendant Tannenbaum reaping more than $87.5 million in the IPO and Defendant Berman reaping more than $5.8 million while these individuals still maintained control and the option to again reap a windfall in the future.

## VIII.  THE REGISTRATION STATEMENT CONTAINED MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND/OR OMITTED MATERIAL INFORMATION REQUIRED TO BE STATED THEREIN

110.    The Registration Statement issued in connection with the IPO contained materially false and/or misleading facts, omitted to state other facts necessary to make the statements made not misleading, and was otherwise not prepared in accordance with the governing rules and regulations.

---

[15] While the Class B common stock held no economic rights, its holders were entitled to five votes per share, whereas the Class A common stock holders only received one vote per share.  Therefore, the principals of FSAM would retain 97.3% of the combined voting power over FSAM, while the Class A shareholders collectively held only 2.7% of voting power.

111.    The Registration Statement touted the growth of the Company's AUM during the

prior year that directly led to FSAM's increased fees prior to the IPO.  For example, the Registration

Statement, in relevant part, stated:

> ***Strong Growth in Assets Under Management, Revenues and Earnings.*** From
> December 31, 2010 to June 30, 2014, our AUM has increased by a compound annual
> growth rate, or CAGR, of 52.7%. We have increased AUM by organically growing
> our existing funds and developing profitable new funds and strategies. From our
> inception we have generated outstanding performance for each asset class and fund
> we have advised. This performance has helped drive growth in our AUM, and as we
> have grown our AUM, our revenues have also increased in a consistent manner.
> From 2010 to 2013, management fee revenues increased by a CAGR of 40.2%.

112.    Specifically, FSAM reported in the Registration Statement that its fee-earning AUM

had increased to $4.3 billion and that as a result, its management fees had likewise correspondingly

increased:

> Fee-earning AUM increased to $4.3 billion as of June 30, 2014, which represented a
> $372.7 million, or 9.5%, increase from $3.9 billion as of December 31, 2013.
>
> ***
>
> For the six months ended June 30, 2014 and June 30, 2013, 96.1% and 92.5%,
> respectively, of our revenues came from management fees (including 37.7% and
> 44.0%, respectively, of Part I Fees) from FSC and FSFR.
>
> ***
>
> Total management fees were $45.1 million for the six months ended June 30, 2014,
> which represented a $14.9 million, or 49.4%, increase from $30.2 million for the six
> months ended June 30, 2013. This increase was comprised of an $11.5 million, or
> 72.7%, increase in base management fees and a $3.4 million, or 23.7%, increase in
> Part I Fees. The increase in total management fees was primarily due to increases in
> fee-earning AUM during the year-over-year period of $1.1 billion, or 38.9%, at FSC
> and a $12.0 million, or 16.2%, year-over-year increase in pre-incentive fee net
> investment income generated by FSC.
>
> ***
>
> From December 31, 2010 to June 30, 2014, our AUM has increased by a compound
> annual growth rate of 52.7%. We have increased AUM by organically growing our

existing funds and developing profitable new funds and strategies. From our inception we have generated outstanding performance for each asset class and fund we have advised. This performance has helped drive growth in our AUM, and as we have grown our AUM, our revenues have also increased in a consistent manner.

113.     The Registration Statement also claimed that FSAM's earnings were predictable and

with little risk:

> **_High-Quality and Predictable Earnings._**  In 2013, approximately 93% of our total revenue was comprised of management fees …We include Part I Fees in management fees because they are consistent, highly predictable and, like our base management fees, paid quarterly in cash. Since a significant percentage of our revenues consist of management fees, our revenues are highly predictable. For the last 24 quarters and since the initial public offering in June 2008 of FSC, our largest fund, FSC's net investment income has always exceeded both the 8% hurdle rate and the 10% catch-up provision. This performance is a consequence of our focus on credit strategies and funds, which generate fees that are more stable and less volatile than those of investment managers that are more equity-focused. The underlying portfolios of our strategies and funds are well diversified with little industry concentration risk. No industry composes more than 15%, in the aggregate, of the portfolios of our funds, as of June 30, 2014. In addition, approximately 99% of our total revenues in 2013 were generated from publicly traded permanent capital vehicles with unlimited duration. As we grow our existing investment vehicles and develop new funds and products, we expect that the contribution of revenues from non-permanent capital vehicles will increase in the future.

114.     Additionally, the Registration Statement repeatedly touted the Company's ability to

continue to grow its AUM and expand funding sources:

> **_Continue to Grow our Existing Investment Vehicles._**  We expect to continue to grow the AUM of our existing investment vehicles. Alternative assets are experiencing increasing demand from a range of investors, which we and many industry participants believe is part of a long-term trend to enhance portfolio diversification and to meet desired return objectives. We believe that our proven track record of outstanding investor performance and brand reputation will continue to attract new investments and capital to our funds. Our BDCs are particularly well-positioned to grow from the increasing retail interest in alternative investments….

> **_Grow Direct Originations._**  We believe we can meaningfully grow our originations to support the growth of our BDCs, private funds and future products. We maintain over 300 private equity sponsor relationships and are well-positioned to be a sponsor's first call when seeking leverage. In addition, there are over 2,500 middle market private equity sponsors in the United States, providing us with significant opportunities to expand these relationships. We also have an active loan syndication

dimension to our origination efforts. We maintain communications with and sourcing from other lenders and we expect our trading relationships to provide consistent deal flow that can bridge gaps in direct origination. We believe we can further penetrate our existing private equity sponsor relationships to source more assets, build new relationships and continue to grow our capital markets sourcing channel.

**Expand Funding Sources.**  We have demonstrated an ability to raise capital from a number of different funding sources, including retail and institutional shareholders in our permanent capital vehicles, bank credit facilities, institutional fund investors, high net worth individuals, family offices, Small Business Investment Company debentures, convertible debt, retail "baby bonds," unsecured senior institutional debt and separately managed accounts. Fifth Street has an attractive funding profile that is diversified, priced competitively and with maturities that exceed the expected lives of our assets. Our new funds and strategies will be able to attract complementary sources of capital that did not previously have a place in the Fifth Street platform, including senior agented deals, where we use our sponsor relationships to win, structure and underwrite senior facilities and distribute post-close, as well as structured equity where we see opportunities to provide solutions to sponsors at an attractive risk-adjusted return. We intend to expand the sources from which we seek funding to include strategy-focused funds, pension funds, insurers and institutional private capital.

115.    Moreover, the Registration Statement touted that "[a]s of and for the six months ended June 30, 2014, no investments were put on non-accrual status."

116.    The Registration Statement also highlighted FSAM's purported "culture of compliance," and its extensive internal controls and processes to mitigate and prevent wrongdoing:

Rigorous legal and compliance analysis of our businesses and investments is important to our culture. We strive to maintain a culture of compliance through the use of policies and procedures, such as oversight compliance, codes of ethics, compliance systems, communication of compliance guidance and employee education and training. We have a compliance group that monitors our compliance with the regulatory requirements to which we are subject and manages our compliance policies and procedures. Our Chief Compliance Officer supervises our compliance group, which is responsible for monitoring all regulatory and compliance matters that affect our activities. Our compliance policies and procedures address a variety of regulatory and compliance risks, such as the handling of material, non-public information, personal securities trading, document retention, potential conflicts of interest and the allocation of investment opportunities. Senior management is involved at various levels in all of these functions, including through active participation on oversight and credit committees.

117.   The Registration Statement also touted its recently announced $0.30 per share quarterly dividend:

**Dividends**

We expect to distribute as dividends to holders of our Class A common stock, on a quarterly basis, substantially all of our allocable share of Fifth Street Holdings' distributable earnings, net of applicable corporate taxes and amounts payable under the tax receivable agreement, in excess of amounts determined to be necessary or appropriate to be retained by Fifth Street Holdings or its subsidiaries to provide for the conduct of our businesses, to make appropriate investments in our businesses and our funds, to comply with the terms of our debt instruments, other agreements or applicable law or to provide for future distributions to us and the Holdings Limited Partners for any ensuing quarter. We intend to fund our dividends from our portion of distributions made to us by Fifth Street Holdings which, in turn, will fund its distributions to us from distributions that it receives from its subsidiaries. We expect that our first dividend will be paid in the first quarter of 2015 (in respect of the fourth quarter of 2014) and will be $0.30 per share of our Class A common stock.

118.   As discussed herein, the Registration Statement was false and misleading because it failed to disclose: (1) that FSC's investments in TransTrade, Phoenix, JTC and CCCG should have been put on non-accrual status prior to the IPO; (2) that, as a result, the value of these assets were overstated as was FSC's "Pre-Investment Fee Net Investment Income"; (3) that FSC had overpaid FSAM fees; (4) that FSAM's AUM,  revenue, net income and fees from FSC were all overstated; and (5) that, as a result, FSAM's announced dividend was not maintainable.

119.   The Registration Statement also failed to disclose that FSAM's conduct as the investment manager for FSC, as alleged herein, had impaired its ability to maintain its AUM growth and its ability to generate additional fee income, which put its investment advisory contract with FSC at risk.  Additionally, the Registration Statement falsely portrayed the credit quality of FSC's portfolio by failing to disclose that it had been negatively impacted by the degradation in credit quality of certain of its investment.  Moreover, the Registration Statement failed to disclose that, as later admitted, FSAM had undisclosed weaknesses in its controls over financial reporting.

120.    In addition, in failing to make these disclosures, Defendants failed to provide the information required by Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), which required defendants to disclose "*any* known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Similarly, the regulation requires the Registration Statement to disclose events that the registrant knew would "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected." 17 C.F.R. §229.303(a)(3)(i), (ii).

121.    Defendants violate Item 303 by failing to disclosed in the Registration Statement that a substantial portion of FSC's debt portfolio consisted of non-performing or at risk loans and that FSAM had grown its AUM in part by delaying the write-down of impaired assets, improperly recognizing income and failing to place assets on non-accrual status when required, as the underperformance of FSC's loans and the true reasons for FSAM's growth in AUM and the condition of its AUM were events and uncertainties that would (and did) have a materially adverse impact on FSAM's revenues and operations.

## IX.    POST-IPO DISCLOSURES

122.    On December 15, 2015, FSAM announced its 2014 fiscal third quarter financial results.  Therein, the Company, in relevant part, stated:

**Results of Operations**

Total revenues increased by 44.1%, or $7.8 million, to $25.4 million for the quarter ended September 30, 2014, as compared to $17.6 million for the quarter ended September 30, 2013. The growth in total revenues was driven by a 60.6% increase in year-over-year fee-earning AUM. Management Fees (which include base

management fees and Part I fees) for the quarter ended September 30, 2014 were $23.1 million, or 90.8% of total revenues.

After adjusting for non-recurring items, total expenses increased by 31.1%, or $2.2 million, to $9.4 million for the quarter ended September 30, 2014, as compared to $7.2 million for the quarter ended September 30, 2013. The increase in expenses was due primarily to increases in occupancy costs and other general and administrative expenses.

Pro Forma Adjusted Net Income increased by 22.3%, or $2.1 million, to $11.8 million for the quarter ended September 30, 2014, as compared to $9.7 million for quarter ended September 30, 2013. Pro Forma Adjusted Net Income per share was $0.24 for the quarter ended September 30, 2014, versus $0.19 per share for the quarter ended September 30, 2013. Pro Forma Adjusted Net Income reflects changes related to our IPO, including an adjustment for federal, state and local corporate income taxes, net of tax benefits related to basis adjustments.

**Dividend Declaration**

Our Board of Directors continues to expect that it will declare a dividend of $0.30 per share for the quarter ending December 31, 2014. Management expects to communicate this dividend, as declared by the Board, during the week of January 19, 2015. Based on current market conditions, including our two publicly-traded BDCs trading below net asset value, we believe that the $0.30 per share dividend would represent a dividend payout ratio greater than 100% of adjusted net income per share for the fourth quarter of 2014. Furthermore, we believe that a $0.30 quarterly dividend per share on an annualized basis would exceed 90% of our 2015 estimated adjusted net income per share.

123.   On  February 9, 2015, FSC announced its financial results for its fiscal 2015 first quarter, which was the same quarter in which the IPO was conducted, and filed their Quarterly Report on Form 10-Q for this period. Therein, FSC revealed that it had recorded a staggering $62 million depreciation on its debt and equity investments during the quarter, while its quarterly net realized losses exceed $17.6 million. FSC also revealed that four of its investments had all been placed on non-accrual status during the quarter and that a fifth would likely be placed on non-accrual the subsequent quarter.  These four investments totaled approximately $106 million at cost, or nearly 5% of FSC's entire debt portfolio. As a further indication of the rapid deterioration in the quality of FSC's portfolio, FSC stated its total assets had increased to $2.9 billion at quarter end, which

represented a more than 20% increase compared to the total assets at the end of the corresponding quarter the prior fiscal year, *yet its net investment income had actually decreased by 3% compared to that quarter*.  Additionally, with only $0.23 in net investment income per share, FSC fell well short of covering its $0.28 per share quarterly dividend declared just prior to the IPO and was forced to record an earnings per share loss of $0.20. Symptomatic of FSC's bleak prospects, FSC stated that it would pay no dividend at all for February 2015, and would slash future dividends by 30% in subsequent months as part of a more "conservative" dividend policy.

124.    That same day, FSC hosted a conference call with investors and analysts to discuss the disappointing earnings results. On the call, one expressed "surprise[]" to see all of FSC's "unrealized and realized losses, both in magnitude and number of investments." Another analyst stated that it "does not make sense" to have "a fee structure that allows the manager to be paid more annually despite net share declines and dividend declines" to shareholders. Yet another analyst asked for help in understanding "what has changed in the financial planning or in the environment over the last six months to now decrease the dividend," given that FSC had just "increased the core dividend in August."

125.    FSAM shares declined $1.08 per share, or 8.01%, to close on February 9, 2015, at 12.40 per share, on unusually heavy volume.

126.    On February 25, 2015, Fitch Ratings published an article entitled, "Fitch Downgrades Fifth Street Finance Corp.'s Ratings to 'BB+'; Outlook Negative."  Therein, the article, in relevant part, stated:

> Fitch Ratings has downgraded Fifth Street Finance Corp.'s (FSC) long-term Issuer Default Rating (IDR), secured debt rating, and unsecured debt rating to 'BB+' from 'BBB-'. The Rating Watch Negative assigned to FSC on July 31, 2014 has been removed. The Rating Outlook is Negative. A complete list of affected ratings is included at the end of this release.

KEY RATING DRIVERS

**The rating downgrade reflects FSC's higher leverage levels, combined with increased portfolio risk, an inconsistent dividend policy, material portfolio growth in a very competitive underwriting environment, asset quality deterioration, and weaker operating performance.**

During 2014, FSC increased the upper-bound of its long-term leverage target from 0.7 times (x) to 0.8x, excluding SBA debt, which is exempt from regulatory asset coverage calculations, but is included in Fitch's assessment of FSC's leverage. Including SBA debt in FSC's leverage calculation translates to total leverage tolerance of 0.96x. Fitch views the increased leverage target as aggressive, particularly given the portfolio shift into second lien securities and increased use of leveraged off-balance sheet vehicles, including the senior loan fund (SLF) and Healthcare Finance Group LLC (HFG).

Furthermore, regulatory leverage exceeded the company's new limit in three of the last four quarters, and amounted to 0.83x at Dec. 31, 2014, or 0.99x including SBA debt. This compares to 0.61x average leverage for investment grade-rated peers as of Sept. 30, 2014.

**On Feb. 20, 2015, FSC's stock was trading at a 21.3% discount to net asset value, which is likely to restrict the firm from accessing the equity markets for some time. As a result, cash generated from portfolio repayments and sales will be needed to reduce leverage, which could constrain FSC's ability to take advantage of investment opportunities, relative to the peer group.**

**The increased leverage target comes as FSC's investment portfolio has gradually shifted into riskier assets, in Fitch's view.** Although FSC remains a senior lender with 55.9% of the portfolio invested in first lien positions, at Dec. 31, 2014, this is down from 70.1% at Sept. 30, 2012. Fitch also calculates an adjusted measure of first lien exposure, converting investments recorded as loans to HFG and First Star Aviation to equity, as FSC wholly owns those companies and is in a first-loss position. On this basis, as of Dec. 31, 2014, Fitch calculates that FSC's first lien and equity exposures stood at 49.9% and 15.9% of the portfolio, respectively.

While positions in HFG and the SLF represent investments in diversified pools of loans, they are akin to equity investments in lowly-levered CLOs, which incrementally alters the firm's risk profile. Management has articulated its intention to grow the SLF and/or add similar programs as an important driver of earnings growth, which combined with an elevated leverage tolerance, is viewed by Fitch as consistent with a below investment grade credit profile.

FSC announced a steep (34.5%) dividend cut in February 2015, citing a slower-than-expected ramp of the SLF and reduced fee expectations, given more limited capital available for growth. The dividend cut followed a 10% increase in the dividend in

July 2014; above run-rate core earnings, which was viewed as aggressive by Fitch in the face of a still challenging yield spread environment and unsustainable non-accrual levels. In November 2013, FSC cut its dividend 13%, a move that was deemed prudent by Fitch. ***The inconsistent dividend policy speaks to poor financial planning and has likely cost the firm some credibility with equity investors; an important source of growth capital.***

FSC's investment portfolio grew 49.6% in 2013, followed by 17.9% additional expansion in 2014. Fitch remains cautious of outsized portfolio growth in the current credit environment, which is generally characterized by tighter yield spreads, higher underlying portfolio company leverage, and weaker covenant packages. Fitch believes significant exposure to more recent vintages could yield outsized asset quality issues down the road.

While Fitch believes industrywide credit metrics are at unsustainable levels longer term, FSC did stand-out in the fourth quarter of 2014; ***moving four investments to non-accrual status, with one more expected in the first quarter of 2015.*** Non-accruals accounted for 4.03% of the portfolio at cost, and 2.33% at fair value, as of Dec. 31, 2014, compared with the investment grade peer average of 0.90% at cost, and 0.55% at fair value, as of Sept. 30, 2014. FSC recorded a $17.6 million realized loss and additional $48.2 million in unrealized losses, which reduced book value by 2.6% and inflated leverage by 0.04x.

(Emphasis added.)

127.    On February 25, 2015, *The Motley Fool* published an article by Jordan Wathen entitled, "Fifth Street Finance Corp. Gets Slapped With a Downgrade From Fitch." Therein, the article, in relevant part, stated:

The biggest difference in the world of nonbank lenders is credit availability the ability to borrow money at attractive interest rates. The lower a firm's borrowing costs, the fatter the spread between its cost of funds and yields on its investments. Fifth Street Finance (NASDAQ:FSC) took a step backward on Monday, getting a downgrade from Fitch (from BBBto BB+), a move from investment grade to junk.

Ratings cuts don't come without explanation. In a press release, Fitch highlighted concerns about Fifth Street Finance's use of leverage, its hidden equity exposures, and the company's lack of a responsible dividend policy.

**On above average portfolio leverage**

Fifth Street Finance has long teetered on the limit for leverage for BDCs rated investment grade. The limit is generally seen to be roughly 0.85 times equity, or $0.85 of debt on balance sheet for every $1 in equity to keep an investment-grade rating. In its explanation, Fitch noted that the company has run with higher leverage

for some time:

> During 2014, FSC increased the upper-bound of its long-term leverage target from 0.7 times (x) to 0.8x, excluding SBA debt, which is exempt from regulatory asset coverage calculations, but is included in Fitch's assessment of FSC's leverage. Including SBA debt in FSC's leverage calculation translates to total leverage tolerance of 0.96x.

> Furthermore, regulatory leverage exceeded the company's new limit in three of the last four quarters, and amounted to 0.83x at Dec. 31, 2014, or 0.99x including SBA debt. This compares to 0.61x average leverage for investment grade rated peers as of Sept. 30, 2014.

In other words, Fifth Street Finance's regulatory leverage sits at just 0.83 times equity, but when its SBA debt is included, which doesn't count against its regulated limit of one times equity, leverage sits at 0.99 times equity.

It goes without saying that to work back up to an investment-grade rating, Fifth Street will invariably need to take its foot off the gas pedal. And to do so, it will have to sell assets and repay debt, cutting into its earnings power going forward.

Now you know why Fifth Street decided to cut its dividend so aggressively from $0.09 per share, per month, to $0.06 per share, per month. It wasn't just about its falling fee income; it was also a clue that it may have to cut back on leverage.

***

**On credibility with investors**

Fifth Street's inconsistent dividend policy is costing it valuable reputational capital. Dividends were cut to start 2014, only to be raised in the summer of 2014, despite an inability to cover the new rate with earnings. Of course, the dividend increase in July 2014 proved to be pie in the sky, so the dividend was lowered when it reported earnings for the fourth calendar quarter.

We also shouldn't forget that in the fall of 2014, shareholders of another Fifth Street-managed fund were beaten over the head with a huge dilutive stock sale, all to make the asset manager a little more money. These actions have snowballed into a huge credibility problem.

Suffice it to say, Fifth Street hasn't been a very good steward of shareholder confidence. Fitch cited it as another reason for a downgrade: "The inconsistent dividend policy speaks to poor financial planning and has likely cost the firm some credibility with equity investors; an important source of growth capital."

Unlike the ratings agencies, I don't have to avoid offending anyone with careful language. Here's what Fitch really means: It's hard to believe that Fifth Street Finance shares will trade back to net asset value, which would allow it to grow, given its poor treatment of shareholders in recent history.

128.    On March 30, 2015, FSAM filed its fiscal results for the fourth quarter and full year ended December 31, 2014 on Form 10-K. The Form 10-K revealed that in December 2014, FSAM had paid $80,000 for a membership interest in IMME LLC ("IMME"), a limited liability company with the purported purpose of "develop[ing] technology related to the financial services industry" that was co-owned by defendant Tannenbaum's brother. The Form 10-K also revealed that FSAM had purchased a convertible promissory note from IMME for $800,000. In addition, the Form 10-K stated that FSAM would not be providing "management's assessment regarding internal control over financial reporting or an attestation report of our independent registered public accounting firm due to a transition period established by rules of the SEC for newly public companies."

129.    On May 11, 2015, FSC announced its financial results for its 2015 fiscal second quarter in which it indicated that investment income and business fundamentals had continued to deteriorate, negatively impacting FSAM's ability to generate fee income. Additionally, FSC reported net investment income of $29.5 million, or $0.19 per share, a decrease of 16% from the prior quarter and a decrease of more than 25% as compared to the quarter leading up to the IPO. Moreover, FSC's quarterly fee income plummeted from $17.9 million in the prior fiscal quarter to just $5.7 million, which indicated that FSC had run into difficulties generating the liquidity needed to fund new investments.

130.    On May 15, 2015, FSAM announced its 2015 fiscal first quarter financial results in which it disclosed that the Company's net income had declined to $9.3 million from $11.8 million in the previous quarter, a more than 25% decline, even though the Company's AUM increased during this same period.  As the Company, in relevant part, stated:

**Results of Operations**

Total revenues increased by 4.6%, or $1.1 million, to $24.9 million for the quarter ended March 31, 2015, as compared to $23.8 million for the quarter ended March 31, 2014. The growth in total revenues was driven by a 22.4% increase in year-over-year fee-earning AUM. Management fees (which include base management fees and Part I fees) for the quarter ended March 31, 2015 were $23.6 million, or 94.8% of total revenues.

After adjusting for non-recurring and reimbursed items, net expenses increased by 27.9%, or $2.1 million, to $9.8 million for the quarter ended March 31, 2015, as compared to $7.7 million for the quarter ended March 31, 2014. The increase in net expenses was due primarily to increases in employee costs due to additions in headcount of 20 employees during the year-over-year period.

Pro Forma Adjusted Net Income was $9.3 million for the quarter ended March 31, 2015, which represented a $0.9 million, or 8.7%, decrease as compared to $10.2 million for quarter ended March 31, 2014. Pro Forma Adjusted Net Income per share was $0.19 for the quarter ended March 31, 2015, versus $0.20 per share for the quarter ended March 31, 2014. Pro Forma Adjusted Net Income reflects an adjustment for net federal, state and local corporate income tax expenses.

**Dividend Declaration**

On May 11, 2015, our Board of Directors declared a quarterly dividend of $0.17 per share of our Class A common stock. The declared dividend is payable on July 15, 2015 to stockholders of record at the close of business on June 30, 2015.

*\*\**

Fee-earning AUM was $5.3 billion as of March 31, 2015, which represented a $230.7 million, or 4.2%, decrease from $5.6 billion as of December 31, 2014. The net decrease in fee-earning AUM was primarily due to $296.5 million net reduction of leverage at our BDCs, which was partially offset by $66.2 million of incremental investment capacity as a result of the securitization of SLF I.

131.    FSAM's shares declined $1.80 per share, or approximately 17%, to close on May 18, 2015 at $8.75 per share, on unusually heavy volume.

132.    On July 14, 2015, FSC issued a press release entitled, "Fifth Street Finance Corp. Finalizes a Waiver to Reduce Base Management Fee to 1% on Future Equity Raises." Therein, FSC, in relevant part, stated:

Fifth Street Finance Corp. (NASDAQ:FSC) ("FSC") today announced that it has finalized a waiver with its investment adviser, a subsidiary of Fifth Street Asset Management Inc. (NASDAQ:FSAM) ("FSAM"), in which FSC's investment adviser has agreed to waive a portion of its base management fee for increases in capital relating to issuances of new equity. Under the waiver, the fee related to new equity will be 1%. The initial term of the waiver is effective until January 1, 2017, at which point it is the intention of FSAM to renew the waiver annually.

Assuming new shares are issued, the blended fee, which will be between 1% and 2%, will be applied in the same manner as currently applied under FSC's investment advisory agreement. All shareholders will be treated equally in the benefit of the fee reduction, regardless of when they invested.

"We are pleased to announce that we have finalized a waiver with our investment adviser that reduces management fees related to future growth," stated Todd G. Owens, Chief Executive Officer, adding, "We believe that by reducing fees on any new share issuances, this both creates additional operating leverage and allows our shareholders to benefit from economies of scale as FSC continues to grow."

133.    On August 13, 2015, FSAM announced its 2014 fiscal second quarter financial results in which it disclosed that its AUM had declined by approximately $1 billion and that its net income had remained stagnant from its previous fiscal quarter.  Therein, FSAM, in relevant part, stated:

**Results of Operations**

Total revenues increased by 3.3%, or $0.8 million, to $24.2 million for the quarter ended June 30, 2015, as compared to $23.4 million for the quarter ended June 30, 2014. Management fees (which include base management fees and Part I fees) for the quarter ended June 30, 2015 were $23.1 million, or 95.4% of total revenues.

After adjusting for non-recurring and reimbursed items, net expenses increased by 25.8%, or $1.9 million, to $9.4 million for the quarter ended June 30, 2015, as compared to $7.4 million for the quarter ended June 30, 2014. The increase in net expenses was due primarily to increases in employee costs due to additions in headcount of 17 employees during the year-over-year period.

Pro Forma Adjusted Net Income was $9.3 million for the quarter ended June 30, 2015, which represented a $2.0 million, or 17.8%, decrease as compared to $11.3 million for quarter ended June 30, 2014. Pro Forma Adjusted Net Income per share was $0.19 for the quarter ended June 30, 2015, versus $0.23 per share for the quarter ended June 30, 2014. Pro Forma Adjusted Net Income reflects an adjustment for net federal, state and local corporate income tax expenses, and excludes the financial results of MMKT Exchange LLC ("MMKT"), a consolidated subsidiary of FSAM that was formed to develop technology related to the financial services

industry. Including the results of MMKT (net of tax), Pro Forma Adjusted Net Income for the quarter ended June 30, 2015 was $9.1 million, or $0.18 per share.

**Dividend Declaration**

On August 10, 2015, our Board of Directors declared a quarterly dividend of $0.17 per share of our Class A common stock. The declared dividend is payable on October 15, 2015 to stockholders of record at the close of business on September 30, 2015.

134.    On August 19, 2015, FSAM filed a Current Report with the SEC on Form 8-K.

Therein, the Company, in relevant part, stated:

> Fifth Street Asset Management Inc. (NASDAQ:FSAM) ("FSAM") announced today that on August 18, 2015, Frank C. Meyer provided notice of his retirement from the Board of Directors and resigned effective as of such date. The Board of Directors appointed Mark J. Gordon to the Audit Committee and David J. Anderson to the Nominating and Corporate Governance Committee to fill the vacancies created by Mr. Meyer's retirement. Additionally, Leonard M. Tannenbaum has been named Chairman of the Nominating and Corporate Governance Committee. At this time, the Board has determined to not fill the vacancy created by Mr. Meyer's resignation and to decrease the size of the Board from seven members to six members.

135.    On October 8, 2015, *The Motley Fool* published an article entitled, "Why Are

Lawyers Gunning for Fifth Street Finance Corp.?"  Therein, the article, in relevant part, stated:

**The TransTrade story**

TransTrade had been in trouble for quite some time. On March 31, 2014, Fifth Street valued its investments in the company at roughly 58% of cost.

While definitions vary, it's generally accepted that a debt security that trades at a 20% discount to par value is, by loose definition, considered "distressed." Valued at a 21% discount to principal and cost in March 2014, TransTrade's first lien term loan fits this definition. We'll start off there.

Here's how Fifth Street Finance valued its investment in TransTrade as of March 2014:

| TransTrade Operators | Principal | 31-Mar-14 Cost | Fair Value |
|---|---|---|---|
| First Lien Term Loan 11% Cash, 3% PIK | 14,656 | 14,656 | 11,494 |
| First Lien Revolver, 8% Cash | | - | - |
| 596.67 Series A Common Units | | - | - |
| 5,200,000 Preferred Units | | 5,200 | - |
| Total | 14,656 | 19,856 | 11,494 |
| Fair Value as Percentage of Cost | | | 58% |

The first lien term loan is valued at about 79% of cost. The preferred and common units are marked to zero; they're worthless as of March 2014.

This is our starting point. Over the next few quarters you'll see how Fifth Street kept this company on life support with additional capital infusions.

**Summertime woes**

Let's move to the next quarter, which ended June 2014. Fifth Street reported that it owned a new security in TransTrade's capital structure, showing that it invested $1.4 million into Series A preferred units, which were immediately written down to zero within the quarter. Notice that the Series A preferred units did not exist in the prior quarter.

| TransTrade Operators | Principal | 30-Jun-14 Cost | Fair Value |
|---|---|---|---|
| First Lien Term Loan 11% Cash, 3% PIK | 15,180 | 15,180 | 11,323 |
| First Lien Revolver, 8% Cash | | - | - |
| 596.67 Series A Common Units | | - | - |
| 1,403,922 Series A Preferred Units | | 1,404 | - |
| 5,200,000 Preferred Units | | 5,200 | - |
| Total | | 21,784 | 11,323 |
| Fair Value as Percentage of Cost | | | 52% |

Also note the slight increase in the cost of its first lien term loan (from $14.7 million to $15.2 million), which will occur in every quarter in excess of the 3% (annual) paid-in-kind rate.

Interest income, though accrued as income in Fifth Street Finance's results, apparently isn't being paid in cash. It appears the bulk of the interest due is accruing to the principal value of the first lien term loan. That's not good.

Yet despite an intraquarter writedown on a new investment in the preferred equity, and the accrual of interest as principal, TransTrade remained on accrual status. Most egregiously, TransTrade was given a risk rating of 1 or 2, which means that it was "performing substantially within [Fifth Street Finance's] expectations" or better.

**More money in autumn**

Fifth Street invested more in TransTrade in the next quarter, presumably so it could keep it on accrual and continue to recognize interest income. The BDC invested another $600,000 in TransTrade's preferred equity, and once again, the investment was immediately marked to zero intraquarter. The principal balance of the first lien term loan jumps again to roughly $15.6 million from $15.2 million.

| TransTrade Operators | Principal | 30-Sep-14 Cost | Fair Value |
|---|---|---|---|
| First Lien Term Loan 11% Cash, 3% PIK | 15,572 | 15,572 | 11,109 |
| First Lien Revolver, 8% Cash | | - | - |
| 596.67 Series A Common Units | | - | - |
| 1,403,922 Series A Preferred Units | | 2,000 | - |
| 5,200,000 Preferred Units | | 5,200 | - |
| Total | | 22,772 | 11,109 |
| Fair Value as Percentage of Cost | | | 49% |

If it weren't clear in March, when TransTrade was valued at 58% of cost, it's quite clear that this isn't a healthy company, now valued at 49% of cost even after new capital infusions. Yet Fifth Street is recognizing income from this investment as if everything is OK.

**FSAM goes public and Fifth Street Finance comes clean**

Fifth Street Asset Management priced its IPO on Oct. 29, 2014, after a rocky IPO process. Its first trading day was Oct. 30.

Finally, in December 2014, TransTrade was put on non-accrual. Fifth Street again doubled down with another $2 million investment in the preferred units, while TransTrade drew down on its revolver. Both investments were immediately impaired, consistent with history. It seems very little has changed.

| TransTrade Operators | Principal | 31-Dec-14 Cost | Fair Value |
|---|---|---|---|
| First Lien Term Loan 11% Cash, 3% PIK | 15,973 | 15,572 | 8,865 |
| First Lien Revolver, 8% Cash | 465 | 465 | 257 |
| 596.67 Series A Common Units | | - | - |
| 4,000,000 Series A Preferred Units | | 4,000 | - |
| 5,200,000 Preferred Units | | 5,200 | - |
| Total | | 25,237 | 9,122 |
| Fair Value as Percentage of Cost | | | 36% |

At this point, Fifth Street had come clean, placing TransTrade and other investments on non-accrual. Fifth Street's earnings report, and its sudden non-accrual problem,

shocked the market. Shares dropped quickly, losing 15% over the full trading day. The timing was impeccable; just imagine if this non-accrual had appeared when its execs were on a road show to pitch shares of the asset management business!

**No one-size-fits-all ratio**

I don't want to rub salt in the wound. Shareholders have experienced enough pain over the last few months. But this serves as an important reminder that a BDC's non-accrual ratio (the percentage of assets for which it isn't recognizing interest or dividend income) is not a perfect metric for understanding credit quality. For months, TransTrade and other investments avoided the non-accrual list despite the fact that they were very stressed and arguably deserved the non-accrual label.

When a BDC wants to move the goal posts by deferring non-accruals, it's quite easy to do. All it takes is a little imagination and a little more capital. If you continuously feed capital to underperformers, then you can forever ensure that an investment will never go bad.

136.     On November 16, 2015, FSC's largest shareholder, RiverNorth, issued a public letter

to FSC's Board of Directors requesting that FSC terminate its advisory agreement with FSAM.  The

letter, in relevant part, stated:

It is clear to us that the market has lost confidence in the Board and the External Manager, as illustrated by the Company's 34% discount to book value. It is extremely troubling that while the External Manager has handsomely profited from aggressive portfolio growth and exorbitant fees, stockholders have suffered greatly under precipitously declining performance. Despite this, the Board has been reluctant to make any significant changes.

                                                    ***

Appalling Historical Performance

 Since inception (6/11/08) – and over almost any measurement period since – FSC has woefully underperformed all relevant benchmarks. Total returns are benchmarked to FSC's IPO on 6/11/08 and are current through 10/30/15.

                                                    ***

Deeply Troubling Misalignment of Interests

Between June 30, 2008 and June 30, 2015 (FSC's most recent reporting period), the External Manager has been paid cumulative base and incentive management fees in the aggregate of $334.7 million. During this time period, the book value has declined

from $13.20 to $9.13 per share. While the Company's book value per share has declined 31% since June 30, 2008, the quarterly fees paid to the External Manager have increased 6.3 times (see chart below). In the past twelve months alone (through 6/30/15), the External Manager has charged the Company's stockholders base and incentive fees totaling $85.4 million. We believe it is clear that the External Manager has benefited from running a larger portfolio while stockholders have suffered from uneconomic growth. The declining book value, net investment income and distributions per share demonstrate this troubling discrepancy. The Company has raised about $1.5 billion in gross proceeds since inception and the External Manager has made a fortune charging FSC stockholders to generate return-free risk.

***

In addition to paying the External Manager high fees for uneconomic growth that has not resulted in stockholder value creation, the incentive fee structure of the Company does not hold the External Manager accountable for credit losses. The incentive fee is paid on NII, not total return. The External Manager charges stockholders an incentive fee on interest income received, even if the loans that generate the interest income result in credit losses. Since inception, the Company has accumulated net realized and unrealized losses of roughly $230 million, including $91 million since 6/30/14. As a "reward" for its performance, the External Manager has charged the Company's stockholders cumulative incentive fees of $147 million. Why are stockholders paying an NII incentive fee while the External Manager is racking up credit losses? Stockholders need an alignment of interests. The industry best practice is to apply a total return high watermark to the NII incentive fee calculation. Without this Case 1:16-cv-01941-LAK Document 1 Filed 01/07/16 Page 26 of 37 - 26 - safeguard, the External Manager has an incentive to reach for yield at the expense of credit quality.

***

Failure to Enact Real Strategic Change Measured by market price to book value, FSC has one of the lowest valuations in the industry. Looking at the roughly 50 publicly traded income BDCs, the market cap weighted average discount to book value is roughly 11%. At the close on November 13, 2015, the market price of the Company was 34% below book value. There is no other BDC with a market capitalization greater than $500 million with a lower price to book valuation.

***

We are steadfast in our belief that stockholder-friendly perspectives and increased independence on the Board are required to ensure improved performance and increased management accountability. Furthermore, we believe the External Manager should be held accountable for its poor performance and misaligned interests. We will ask stockholders to vote to terminate the investment advisory agreement, unless dramatic and sweeping changes are made now.

(Footnote omitted.)

137.    Additionally, on November 16, 2015, FSAM issued a press release announcing that it had rescheduled its earnings report for the quarter ended September 30, 2015 and that it intended to file a notice of extension on Form 12b-25 with the U.S. Securities and Exchange Commission, which it subsequently did.

138.    FSAM's common stock declined $1.57 per share, or 25.40%, to close on November 17, 2015, at $4.61 per share, on unusually heavy volume.

139.    On November 23, 2015, FSAM disclosed that a wholly-owned subsidiary of FSAM had improperly recognized income from certain loan originations at the Fifth Street funds and, as a result, FSAM had been prematurely paid $3.3 million in fees:

> Subsequent to the end of the September quarter, we identified adjustments in the calculation of Part I management fees previously paid to FSAM by Fifth Street Finance Corp. ("FSC") and Fifth Street Senior Floating Rate Corp. ("FSFR") (collectively, "the BDCs"). The identified adjustments related to incorrect information used by the BDCs' Administrator, a wholly-owned subsidiary of FSAM. It was determined that in the case of certain transactions entered into by FSC and FSFR, origination fees that were received at the close of the transaction should be recognized as income over time rather than in the period the transaction closed. As a result of that determination, the BDCs cumulatively paid $3.3 million of Part I management fees prematurely.

140.    On November 25, 2015, J.P. Morgan issued an analyst report on FSAM.  Therein, the analyst report, in relevant part, stated:

> FSAM reported adjusted diluted 3Q15 ENI of $0.18 per share, missing our estimate and consensus by a penny. While the quarter remained challenged by lack of asset growth and higher compensation expense, results held up reasonably well. However, the bigger risk is the uncertainty with regards to FSAM's management agreement with FSC, which is being challenged by activist investors. Despite a very cheap price, we would avoid the stock as we have little comfort from FSAM management on the issue despite much of its business being at stake.

141.    On December 1, 2015, FSC filed its annual report for its fiscal year that ended on September 30, 2015.  Therein, FSC disclosed that it had identified material weaknesses in its internal

controls over financial reporting "related to not having the appropriate design or not properly maintaining effective controls to internally communicate current accounting policies and procedures including the nature of supporting documentation required necessary to validate certain portfolio company data." FSC further disclosed that these accounting errors had overstated its payments to FSAM at the time of FSAM's IPO:

> During the three months ended September 30, 2015, the Company identified errors in the recognition of fee income from fiscal years ended 2012 through 2015, as well as the consolidation of First Star holding companies in 2015. The errors primarily related to recognizing fee income at deal close when the amounts did not represent a separately identifiable revenue stream and instead were more related to underwriting the investment. ***These errors mainly affected the timing of when income should be recognized and were partially offset by the overpayment of Part I Fees paid to FSM.*** The Company assessed the materiality of the errors on its prior quarterly and annual financial statements, assessing materiality both quantitatively and qualitatively, in accordance with the SEC's Staff Accounting Bulletin ("SAB") No. 99 and SAB No. 108 and concluded that the errors were not material to any of its previously issued financial statements. ***The cumulative adjustment as of September 30, 2014 was a reduction of $8.5 million of fee income partially offset by a $3.6 million increase to interest income and a $1.0 million decrease to the incentive fee payable to FSM***, resulting in a $3.9 million reduction to net investment income.

(Emphasis added.) The Form 10-K also disclosed that the termination of the investment advisory agreement with FSAM could lead to an "event of default" with FSC's creditors.

142.    On December 7, 2015, FSAM filed a Current Report with the SEC on Form 8-K. Therein, the Company, in relevant part, announced:

> On December 1, 2015, David J. Anderson resigned as a member of the board of directors (the "Board") of Fifth Street Asset Management Inc. (the "Company") and the Board's Nominating and Corporate Governance Committee. Mr. Anderson's resignation was not the result of any disagreement with the Company on any matter relating to the Company's operations, policies or practices.

> On December 2, 2015, Mark J. Gordon resigned as a member of the Board and the Board's Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee. Mr. Gordon's resignation was not the result of any disagreement with the Company on any matter relating to the Company's operations, policies or practices.

The Board has not yet identified successors to Mr. Anderson or Mr. Gordon. The Board expects to fill these two vacancies before the end of the Company's fiscal year.

As a result of these resignations, all of the Company's purported independent directors on its Corporate Governance Committee had resigned in less than four months, leaving Defendant Tannenbaum as the committee's sole member.

143.    FSAM's common stock declined $0.31 per share, or 7.05%, to close on December 7, 2015, at $4.09 per share, on unusually heavy volume.

## X.    NO SAFE HARBOR

144.    Defendants are liable for any false and misleading forward-looking statements issued in connection with the IPO. The Safe Harbor provision of §27A of the 1933 Act, 15 U.S.C. §77z-2(b)(2)(D), specifically excludes those statements "made in connection with an initial public offering," which includes all of the false and misleading statements made in connection with the IPO.

## XI.    CLASS ACTION ALLEGATIONS

145.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who purchased or otherwise acquired common stock of FSAM pursuant and/or traceable to the Registration Statement issued in connection with the Company's IPO on or about October 29, 2014, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants herein, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

146.    The members of the Class are so numerous that joinder of all members is impracticable. FSAM offered 6 million shares of common stock in the IPO and is actively traded on the NASDAQ. While the exact number of Class members are unknown to Plaintiffs at this time, Plaintiffs believe that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by FSAM or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

147.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

148.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

149.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Sections 11, 12(a)(2), and 15 of the Securities Act were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public in the Registration Statement issued by FSAM in connection with the IPO negligently omitted and/or misrepresented material facts about the business and prospects of FSAM; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

150.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XII.    COUNTS

### A.    COUNT I: For Violations of Section 11 of the Securities Act (Against All Defendants)

151.    Plaintiffs repeat and reallege each and every allegation contained above. This count is predicated upon Defendants' strict liability for making false and materially misleading statements in the Registration Statement.

152.    This Count does not sound in fraud. Any proceeding allegations of fraud, fraudulent conduct, or improper motive are specifically excluded from this Count.  Plaintiffs do not allege for this Count that Defendants had scienter or fraudulent intent, which are not elements of this claim.

153.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

154.    As discussed herein, the Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary in order to make the statements made not misleading, and omitted to state material facts required to be stated therein.

155.    FSAM is the registrant for the IPO. Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

156.    As issuer of the shares, FSAM is strictly liable to Plaintiffs and the Class for any misstatements and omissions.

157.    None of Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

158.    By reason of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

159.    Plaintiffs acquired FSAM common stock pursuant and/or traceable to the Registration Statement for the IPO.

160.    Plaintiffs and the Class have sustained damages. The value of FSAM common stock has declined substantially subsequent to and due to Defendants' violations.

161.    At the time of their purchases of FSAM, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts.  Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiffs filed this complaint.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiffs filed this complaint.

**B.      COUNT II:  For Violations of Section 12(a)(2) of the Securities Act (Against All Defendants)**

162.    Plaintiffs repeat and reallege each and every allegation contained above.

163.    This Count does not sound in fraud. Any proceeding allegations of fraud, fraudulent conduct, or improper motive are specifically excluded from this Count.  Plaintiffs do not allege that Defendants had scienter or fraudulent intent, which are not elements of this claim.

164.     This Count is brought by Plaintiffs, pursuant to Section 12 of the 1933 Act on behalf of the Class who purchased shares of the Company's common stock directly from one of the

underwriters in the IPO.   Plaintiffs bought FSAM common stock directly from one of the underwriters in IPO.

165.    Defendants offered, sold and/or solicited a security, namely shares of FSAM's common stock, by means of the IPO identified above, and sold, or solicited the sale, of FSAM's shares for their own financial benefit. The Registration Statement contained untrue and/or misleading statements of material fact that the Defendants in the exercise of reasonable care should have known were false.

166.    Defendants actively solicited the sale of FSAM's shares to serve their own financial interests.

167.     At the time of purchase of FSAM's shares, Plaintiffs and other members of the Class did not know that the representations made to them by FSAM in connection with the distribution of shares and the matters described above were untrue, and did not know the above described omitted material facts, were not disclosed.

168.    As a result, Plaintiffs and Class members are entitled to tender FSAM shares they purchased and receive from FSAM for the consideration paid for those shares with interest thereon, less the amount of any income received thereon, or damages resulting from Defendants' conduct.

169.    Defendants are liable to Plaintiffs and Class members pursuant to Section 12 (a)(2) of the Securities Act, as seller of FSAM's shares in the IPO.

**C.     COUNT III: For Violations of Section 15 of the Securities Act (Against the Individual Defendants)**

170.    Plaintiffs repeat and reallege each and every allegation contained above.

171.    This Count does not sound in fraud. Any proceeding allegations of fraud, fraudulent conduct, or improper motive are specifically excluded from this Count.   Plaintiffs do not allege for this Count that Defendants had scienter or fraudulent intent, which are not elements of this claim.

172.    This Count is brought pursuant to Section 15 of the Securities Act against the Individual Defendants.

173.    Each of the Individual Defendants acted as controlling persons of FSAM within the meaning of Section 15 of the Securities Act by virtue of his position as a director and/or senior officer of FSAM.  By reason of their senior management positions and/or directorships at the Company, as alleged above, the Individual Defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause FSAM to engage in the conduct complained of herein.  Further, the Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiffs and the Class. By reason of such conduct, the Individual Defendants are liable pursuant to Section 15 of the Securities Act.

174.    Each of the Individual Defendants was a culpable participant in the violations of Section 11 of the Securities Act alleged in Count I above, based on their having signed the IPO Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

175.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages suffered.

## XIII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the other Class members their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees, experts' fees, and other costs and disbursements; and

D.      Awarding such equitable, injunctive, or other relief as this Court may deem just and proper.

## XIV.   JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury.

Respectfully submitted,

Dated: June 13, 2016                       **GLANCY PRONGAY & MURRAY LLP**

By:   *s/ Casey E. Sadler*
Lionel Z. Glancy
Robert V. Prongay
Peter A. Binkow
Casey E. Sadler
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
info@glancylaw.com

- and -

**GLANCY PRONGAY & MURRAY LLP**
Lesley F. Portnoy (LP-1941)
122 East 42nd Street, Suite 2920
New York, New York 10168
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
lportnoy@glancylaw.com

*Lead Counsel for Lead Plaintiff Kieran Duffy and Susan Duffy and for the Class*

**PROOF OF SERVICE BY ELECTRONIC POSTING PURSUANT TO SOUTHERN
DISTRICT OF NEW YORK ECF AND LOCAL RULES AND BY MAIL
ON ALL KNOWN NON-REGISTERED PARTIES**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On June 13, 2016, I served true and correct copies of **AMENDED CLASS ACTION
COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**, by posting
the document electronically to the ECF website of the United States District Court for the
Southern District of New York, for receipt electronically by the parties listed on the Court's
Service List.

I affirm under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct. Executed on June 13, 2016, at Los Angeles, California.


*s/ Casey E. Sadler*
Casey E. Sadler